**AFFIRMED; Opinion Filed July 11, 2013.**



In The

**Court of Appeals**

**Fifth District of Texas at Dallas**

_____

**No. 05-12-00197-CR**

_____

**WAAD JAJEES HABIB, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 203rd Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. F11-55034-P**

## MEMORANDUM OPINION

Before Justices Bridges, FitzGerald, and Myers
Opinion by Justice Myers

Appellant Waad Jajees Habib was convicted of capital murder and sentenced to life imprisonment. In his sole issue, he argues the evidence is insufficient to support the trial court's jury instruction on "provoking the difficulty." We affirm.

### BACKGROUND AND PROCEDURAL HISTORY

Salah Zardeh and Magdi Ibrahim owned the King's Food Market in Dallas, Texas. Prior to the day of the alleged offense, appellant was employed at the market doing various jobs, including electrical work, construction, and nighttime security, but he was not working there at the time of the alleged offense.

On the afternoon of May 4, 2011, appellant entered the store and shot Salah, Magdi, and Eid Faltaous, their employee. Salah and Eid died from gunshot wounds. Magdi survived but

was confined to a wheel chair when he testified at appellant's capital murder trial. The shooting was both audio and video-recorded.

Eid's brother Nasser Faltaous testified through an interpreter that he and his brother came to the United States in 2002. Nasser knew appellant and had seen him in the store on several occasions prior to the alleged offense. He recalled that in January of 2011, he saw appellant in the store arguing with Salah and Eid. Appellant gave both of them a "hard time . . . and he tried to argue with me that day." Eid also told Nasser about an argument that had occurred between appellant and Salah ten days to two weeks prior to the shootings.

Salah's wife Ruhaifa testified that at the time of the alleged offense, appellant's relationship with Salah was not good. About one month before the shootings, she was sitting next to her husband when he received a telephone call from appellant. She heard appellant "being loud and threatening to kill" Salah. She told the jury that Salah did not own a gun, did not keep one at the store for protection, did not like or allow any other weapons there, and he never borrowed money from appellant. She identified State's exhibit 107 as a recording of a voicemail message that she discovered on her husband's phone as she was collecting his belongings shortly after the shootings. The message, which was from appellant, was in Arabic and was left on Salah's phone the day before the shootings. According to the interpreter's translation, appellant said: "Listen, this is your last chance. Solution. I give you a lot of chances. Give me my money. I'm not asking for all of it. Half. If you don't give it to me, this is your last chance. Solution. Bye."

Magdi Ibrahim testified that he emigrated from Egypt and had lived in the United States for fifteen years.[1] He recalled that appellant had a good relationship with Salah for about one

---

[1] Most of Magdi's testimony was in English but he needed occasional assistance from an interpreter.

year.  After that, however, appellant started causing trouble at the store and was "[a]lways fighting" with Salah.  There were times when Salah called the police for assistance.

About two months before the shootings, appellant threatened to kill Salah and Eid, saying, according to Magdi, "I kill Salah and Eid."  Magdi added that "lots of people" heard appellant say this.  Magdi also testified that he feared for his life because of appellant's threats, but Salah never took appellant's threats seriously.

Magdi recalled that, on the day of the shootings, he, Salah, Eid, and some customers were at the store.  Appellant entered the store and went straight towards the back to use the restroom—Magdi said he used the store's restroom "all the time."  When appellant left the restroom, he confronted Salah, "cussed him," and demanded money.  Magdi described what happened next:

> When I see [appellant] come to Salah, I leave the office first and I go to [appellant].  And he tell him, motherfucker, give me the money, give me the money.  Salah tell him, what money.  And I pushed [appellant], I tell him, like I want to keep peace, I push him a little bit.  Right away [appellant] take the gun and shoots Salah, in one second, you know.

Magdi could not remember who was shot next, either himself or Eid.  But he testified that no one threatened to kill appellant before he started shooting, and that no one pointed a gun at appellant.  There were, in fact, according to Magdi, no guns kept at the store.  Magdi recalled that the police found a knife at the crime scene but he did not know where the knife came from, he had never seen it before, he did not have a knife, he had never seen either Salah or Eid carrying the knife, and neither one of them had it in their hands when appellant demanded money and shot Salah.

Arvelia Hill, who witnessed the shootings, testified that she lived near the King's Food Market, knew the owners, and shopped there every day for "two, three years."  She also knew appellant, and she recalled that there were several prior incidents at the store involving appellant.  On one occasion, approximately a week before the shootings, Magdi told appellant that Salah did not want him in the store and appellant told Magdi he was "going to kill them."  In addition, a

month or two before the shootings, appellant came into the store "wanting some money," and started fighting with Salah. Appellant pulled a gun on Salah. The police were called, and appellant went to jail. Hill also testified that whenever appellant came into the store he was always hollering and yelling, and would try to "take things." According to Hill, appellant was the one who "was starting the problems."

Hill testified that, on the day in question, she was in the back of the store, at the soda cooler, when she saw appellant leave the restroom, walk past her, and head to the front counter. Appellant lifted up the counter and tried to enter the office, where Salah was on the telephone. Hill saw Salah put down the phone and push appellant back behind the counter and slam the counter down, telling appellant he "couldn't be up there." Magdi was standing just behind Salah. Salah placed his index finger over his mouth and told appellant "shh," indicating he wanted him to "keep it down." Then appellant chuckled, pulled a gun out of a briefcase or bag, and started shooting. As he fired the gun appellant said: "[H]ow does fifty thousand dollars look now[?] I want some money, give me some money." None of the shooting victims held any weapons, according to Hill.

Hill recalled that she "stood there in shock" as appellant continued firing. Then she remembered that her mother was in the back of the store. After she saw all three of the gunshot victims fall to the floor, Hill ran to the back of the store to be with her mother. Hill also tried to call 911. Appellant started saying everyone inside the store owed him money, that "everybody was going to die," and that "he was going to kill everybody." After he stopped shooting, appellant put his gun "in the potato chip rack."

When police officers arrived at the scene, appellant met them at the door and said repeatedly: "I'm the one you're looking for, I did it. Arrest me." He was not carrying a weapon. Police, however, found a gun on the shelf where the potato chips were displayed, which

was located on the first aisle as you enter the store.  A folded pocket knife was found on the floor near an overturned stool.

Both video and audio recordings of the alleged offense were admitted.  In the edited audio recording, State's exhibit 43, appellant is heard repeatedly and frantically demanding: "Where's my money." "Give me my money." "I told you, mother fucker, where is my money, where is my money?"  Appellant continues demanding "where's my money" as a number of gunshots are heard, followed by screams and moaning.  State's Exhibit 41 is a DVD that contains the edited video from four in-store surveillance cameras on May 4, 2011.  The footage from camera three shows appellant entering the store carrying a bag in his hand, and approaching the front counter.  Both cameras three and four show him lifting up the entrance to the counter and walking past the cash register at approximately 4:24:50 p.m.  According to the view from camera four, after walking past the front counter, appellant attempts to force his way into a small office located just behind the counter.  Two men emerge from the office and try to restrain appellant, assisted by a third man who is attending the cash register.  Appellant struggles with the men briefly before shooting them.  Both the audio and video exhibits were published to the jury.

Appellant testified[2] that nobody ever knew he loaned Salah $50,000 to buy space for another store.  After he loaned Salah the money, appellant and Salah argued about this debt for nine or ten months because Salah changed his mind about the other store, and refused to repay appellant's money.  Appellant said these arguments escalated into threats from Salah, and that Salah threatened to shoot and kill appellant.  Appellant, in turn, threatened to do the "same thing" to Salah.

---

[2] Most of appellant's testimony was in English but he needed occasional assistance from an interpreter.

Appellant recalled that, on the day of the shootings, he went to the store to talk to Salah about the money. Appellant went to the restroom, then approached the front counter. He started to talk to Salah about the money. Appellant testified:

> I was asking, I need money. I told Mr. Salah, I need my money, please. And he jumped to me and said, what money. And after that, I see some—they push me out, they try to fight with me, push me. And I see they are going to pull something from his pocket, and at that time, I'm scared for my life, he's going to shoot me. And I pulled my trigger.

Appellant testified that before he approached Salah to ask him for his money he put the gun in his bag; he was afraid they were going to kill him because they had threatened him on previous occasions. Appellant testified that he saw Salah trying to pull "something shiny" from his pocket. Appellant thought it was a gun, and that was when he reached for the gun in his bag and shot Salah. He also stated that he just pulled the trigger and did not know how many times he shot. On direct examination, appellant testified that after the shooting he "tried to help everybody" and that he called 911 and said "they tried to kill [him]" and he "was scared for [his] life." However, on cross-examination, appellant stated that he actually told the 911 operator that "they" took his money and would not help him. He also admitted on cross-examination that the day before the shooting he had called Salah's phone and left a voice message stating that it was his last chance and that he better get him the money, even if it was just half.

## DISCUSSION

In his issue, appellant argues the trial court erred by instructing the jury, over his timely objection, on "provoking the difficulty" as a limitation on the right to self-defense "because that issue was not raised by the evidence."

When the appellant alleges jury charge error on appeal, we first determine whether the jury charge is erroneous. *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005). If the charge is erroneous, we analyze the error for harm. *Id*. "The degree of harm necessary for

–6–

reversal depends on whether the appellant preserved the error by objection." *Id.* When the appellant preserves the complained-of error by timely objection, we will reverse if we find "some harm" to the appellant's rights. *See id.*

Generally, "a person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force." TEX. PENAL CODE ANN. § 9.31(a). The doctrine of provocation, also known as "provoking the difficulty," is a limitation on the right of self-defense. *See Smith v. State*, 965 S.W.2d 509, 512 (Tex. Crim. App. 1998). The use of force is not justified if the actor "provoked the other's use or attempted use of unlawful force," unless (A) the actor abandons the encounter "or clearly communicates to the other his intent to do so reasonably believing he cannot safely abandon the encounter," and (B) the other person "nevertheless continues or attempts to use unlawful force against the actor." TEX. PENAL CODE ANN. § 9.31(b)(4)(A), (B).

The doctrine of provocation requires an element of intent that is not explicit in the penal code. *See Mendoza v. State*, 349 S.W.3d 273, 279 (Tex. App.—Dallas 2011, pet. ref'd). A charge on provocation is required when there is sufficient evidence (1) the defendant did some act or used some words which provoked the attack on him, (2) such act or words were reasonably calculated to provoke the attack, and (3) the act was done or the words were used for the purpose and with the intent that the defendant would have a pretext for inflicting harm upon the other. *Smith*, 956 S.W.2d at 513. A provocation instruction should be submitted to the jury only "when there is evidence from which a rational jury could find every element of provocation beyond a reasonable doubt." *Id.* at 514. A defendant may have a desire that the other person will attack him, or he may seek the other person with the intent to provoke a difficulty, but the defendant must go further and do or say something that actually provokes the attack before he forfeits his

right to self-defense. *Id.* The elements of provocation are fact questions for the jury. *Id.* at 514-18; *Thomas v. State*, 750 S.W.2d 324, 325 (Tex. App.—Dallas 1988, pet. ref'd). Our inquiry is whether, in the light most favorable to giving the instruction, there was sufficient evidence with which a jury could have found provocation beyond a reasonable doubt. *Smith*, 956 S.W.2d at 514; *Thomas*, 750 S.W.2d at 325.

Appellant contends the trial court erred in instructing the jury on provocation because if appellant acted provocatively "it was only his demand for repayment of his perceived debt" and "such a course of action is legally insufficient" to support a provocation instruction. But the evidence in this case shows more than a dispute over repayment of a debt; it shows a history of animosity between appellant and Salah due to appellant's repeated demands for money from Salah. These demands often escalated into fights between appellant and Salah and led, more than once, to appellant being removed from the store. On one occasion, appellant pulled a gun on Salah and the police were called. A week before the shootings, Magdi told appellant that Salah did not want appellant in the store and appellant told Magdi he was "going to kill them." On the day before the shootings, appellant left a message on Salah's voicemail telling him this was his "last chance" to return appellant's money. There is sufficient evidence from which the jury could reasonably infer appellant knew his acts and words would incite Salah and were reasonably calculated to provoke an attack, and that appellant's acts and words were done for the purpose and with the intent that appellant would have a pretext for inflicting harm upon the victims. Looking at the evidence in the light most favorable to the instruction, we therefore conclude, based on the entirety of the record, that there is sufficient evidence from which the jury could find every element of provocation beyond a reasonable doubt, and that the trial court properly instructed the jury on provocation. Because there is no jury charge error, we do not reach the issue of harm. We overrule appellant's issue.

We affirm the trial court's judgment.

Lana Myers
LANA MYERS
JUSTICE

Do Not Publish
TEX. R. APP. P. 47
120197F.U05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

WAAD JAJEES HABIB, Appellant

No. 05-12-00197-CR          V.

THE STATE OF TEXAS, Appellee

On Appeal from the 203rd Judicial District Court, Dallas County, Texas
Trial Court Cause No. F11-55034-P.
Opinion delivered by Justice Myers.
Justices Bridges and FitzGerald participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 11th day of July, 2013.

/Lana Myers/

LANA MYERS
JUSTICE