ACCEPTED
05-14-01028-CR
FIFTH COURT OF APPEALS
DALLAS, TEXAS
7/1/2015 10:07:21 AM
LISA MATZ
CLERK

*The State requests oral argument only if Appellant argues.*

No. 05-14-01028-CR

RECEIVED IN
5th COURT OF APPEALS
DALLAS, TEXAS
7/1/2015 10:07:21 AM
LISA MATZ
Clerk

# IN THE COURT OF APPEALS
# FOR THE FIFTH DISTRICT OF TEXAS
# AT DALLAS

---

## ADOLPH JUNIOR MENJIVAR,
*APPELLANT*

v.

## THE STATE OF TEXAS,
*APPELLEE*

---

*On appeal from the 291st Judicial District Court
of Dallas County, Texas
in Cause No. F13-57185-U*

---

## STATE'S BRIEF

---

*Counsel of Record:*

Susan Hawk
*Criminal District Attorney*
Dallas County, Texas

Marisa Elmore
*Assistant District Attorney*
State Bar No. 24037304
Frank Crowley Courts Building
133 N. Riverfront Boulevard, LB-19
Dallas, Texas  75207-4399
(214) 653-3625
(214) 653-3643 *fax*
marisa.elmore@dallascounty.org

*Attorneys for the State of Texas*

# TABLE OF CONTENTS

INDEX OF AUTHORITIES ...................................................................................iii

STATEMENT OF THE CASE .................................................................. 1

STATEMENT OF FACTS ........................................................................ 1

SUMMARY OF ARGUMENT .................................................................. 23

ARGUMENT ........................................................................................... 24

> **RESPONSE TO APPELLANT'S SOLE ISSUE:** APPELLANT WAS NOT ENTITLED TO A JURY INSTRUCTION ON SELF-DEFENSE; HENCE, THE TRIAL COURT DID NOT ERR IN SUBMITTING A PROVOCATION INSTRUCTION TO THE JURY.
>
> IN THE ALTERNATIVE, THE TRIAL COURT DID NOT ABUSE ITS DISCRETION BY INCLUDING A PROVOCATION INSTRUCTION IN THE JURY CHARGE........................................................................ 24
>
> **STATE'S CROSS-POINT:** THE TRIAL COURT SHOULD MODIFY THE JUDGMENT TO REFLECT APPELLANT'S PLEAS OF NOT TRUE TO THE ENHANCEMENT ALLEGATIONS AND TO REFLECT THE JURY'S FINDINGS OF TRUE........................................................... 43

PRAYER ................................................................................................. 45

CERTIFICATE OF WORD COMPLIANCE ............................................ 45

CERTIFICATE OF SERVICE ................................................................. 45

ii

# INDEX OF AUTHORITIES

**Cases**

*Acosta v. State,*
  No. 05-11-01165-CR, 2013 Tex. App. LEXIS 1966 (Tex. App.—Dallas
  Feb. 27, 2013, no pet.) (mem. op., not designated for publication)............. 37

*Almanza v. State,*
  686 S.W.2d 157 (Tex. Crim. App. 1985) (op. on reh'g)............................ 42

*Asberry v. State,*
  813 S.W.2d 526 (Tex. App.—Dallas 1991, pet. ref'd) .............................. 44

*Bigley v. State,*
  865 S.W.2d 26 (Tex. Crim. App. 1993).................................................... 44

*Dyson v. State,*
  672 S.W.2d 460 (Tex. Crim. App. 1984)...........................................26, 30

*Gill v. State,*
  No. 01-98-00674-CR, 1999 Tex. App. LEXIS 6691 (Tex. App.—Houston
  [1st Dist.] Sept. 2, 1999, pet. ref'd) (not designated for publication) ........... 40

*Granger v. State,*
  3 S.W.3d 36 (Tex. Crim. App. 1999) ...................................................... 26

*Hutch v. State,*
  922 S.W.2d 166 (Tex. Crim. App. 1996).................................................. 42

*Jimenez v. State,*
  32 S.W.3d 233 (Tex. Crim. App. 2000)................................................... 42

*Matthews v. State,*
  708 S.W.2d 835 (Tex. Crim. App. 1986).................................................. 40

*McCoy v. State,*
  No. 05-14-00227-CR, 2015 Tex. App. LEXIS 5202 (Tex. App.—
  Dallas May 21, 2015, no pet. h.) (mem. op., not designated
  for publication) ...................................................................... 27, 28, 29, 31, 32

*Medina v. State,*
  7 S.W.3d 633 (Tex. Crim. App. 1999)..................................................... 43

*Mendoza v. State,*
  349 S.W.3d 273 (Tex. App.—Dallas 2011, pet. ref'd). ..............32, 34, 35, 42

*Morales v. State,*
  357 S.W.3d 1 (Tex. Crim. App. 2011).................................................... 25

*Ngo v. State,*
  175 S.W.3d 738 (Tex. Crim. App. 2005)............................................25, 42

*Reese v. State,*
  No. 02-10-00143-CR, 2011 Tex. App. LEXIS 5445 (Tex. App.—Fort Worth
  July 14, 2011, no pet.) (mem. op., not designated for publication)............. 30

*Rubio v. State,*
  No. 05-10-00583-CR, 2011 Tex. App. LEXIS 9326 (Tex. App.—
  Dallas Nov. 29, 2011, pet. ref'd) (not designated for publication) .............. 37

*Ruiz v. State,*
  No. 05-06-00415-CR, 2007 Tex. App. LEXIS 596 (Tex. App.—Dallas
  Jan. 29, 2007, pet. dism'd) (not designated for publication)....................... 31

*Smith v. State,*
  965 S.W.2d 509 (Tex. Crim. App. 1998) ................................32, 33, 38, 40

*Vasquez v. State,*
  67 S.W.3d 229 (Tex. Crim. App. 2002).................................................... 41

*Warren v. State,*
  565 S.W.2d 931 (Tex. Crim. App. 1979)................................................. 26

**Statutes**

Tex. Penal Code Ann. § 2.03 (West 2011) ................................................... 26

Tex. Penal Code Ann. § 9.31 (West 2011) ............................................26, 30

Tex. Penal Code Ann. § 9.32 (West 2011) ............................................26, 27

Tex. Penal Code Ann. § 19.02 (West 2011) ................................................. 25

**Rule**

Tex. R. App. P. 43.2(b) .............................................................................. 44

TO THE HONORABLE COURT OF APPEALS:

The State of Texas submits this brief in response to the brief of Appellant, Adolph Junior Menjivar.

## STATEMENT OF THE CASE

A grand jury indicted Appellant for murder. (RR2: 5-6; CR: 10). Appellant pled not guilty, claiming he acted in self-defense, but a jury found him guilty. (RR2: 177; RR8: 56; CR: 226). At the punishment phase of trial, Appellant pled not true to an enhancement paragraph alleged in the indictment and to an enhancement alleged by the State in a Notice of Intent to Enhance Punishment Range with Prior Felony Conviction. (RR8: 64-65; CR: 10, 51). After hearing punishment evidence, the jury found the enhancement allegations to be true and assessed Appellant's punishment at 65 years' confinement in the Institutional Division of the Texas Department of Criminal Justice. (RR9: 57; CR: 216). Appellant filed a motion for new trial, which the trial court overruled by operation of law, and filed a timely notice of appeal. (CR: 224-23).

## STATEMENT OF FACTS

In the early morning hours of June 23, 2013, Appellant stabbed Fernando Lopez to death after a brief altercation in a Fiesta Supermarket parking lot. (RR2: 184-85; RR3: 90, 115; RR4: 179). Immediately after

Appellant stabbed Fernando, Fernando's three friends and other bystanders attacked him.[1] During the "tussle," someone threw a beer can at Appellant's head, and someone sprayed him with mace. (RR4: RR7: 192, 194, 229-30). Appellant suffered a broken ankle and a cut arm and was transported by ambulance to Methodist Hospital. (RR4: 132; RR7: 231, 233; SX 67).

At trial, the State's theory of the case was Appellant became angry when Fernando and his three friends "disrespected" him by calling him a "bitch" during a traffic altercation. (RR8: 44-45). Appellant waited until Fernando was sitting in his car with his back turned and stabbed him to death in retaliation. (RR8: 44-45). Appellant, who testified at trial, admitted he stabbed Fernando, but claimed he did so in self-defense because he believed the four men were going to pursue him in their car and shoot him "down the block." (RR8: 44).

**Testimony of Martin Rodriguez, Michael Rodriguez, and Gustavo Rodriguez**

Somewhere between ten o'clock and midnight on the evening preceding the murder, brothers Gustavo and Michael Rodriguez, their cousin, Martin Rodriguez, and their friend, Fernando Lopez, the victim, went to 2 One 6, a

---

[1] Because several witnesses had the same surnames, for the sake of clarity the State will refer to all witnesses by their given names.

bar they frequented in Dallas's Oak Cliff neighborhood.[2] (RR2: 184-85; RR3: 124-26, 148, 150; RR4: 22, 27). The four men rode together in Martin's car, a gray Dodge Charger. (RR3: 150; RR4: 167). Martin, who was driving, parked the Charger in the parking lot of a Fiesta Supermarket, their usual location, which was across the street from the bar.[3] (RR3: 126, 150-51; RR4: 27-28).

After drinking and "hanging out" at the bar, the four men left to go home around the two o'clock a.m. closing time. (RR3: 125-26, 150; RR4: 29). The men did not have a confrontation with anyone inside the bar or on their way to the car. (RR3: 150-51; RR4: 27-28). All four men got into the car with Fernando sitting in the front passenger seat, Michael sitting in the back seat behind Martin, who was driving, and Gustavo sitting in the back seat behind Fernando. (RR3: 151; RR4: 28).

Martin drove in a loop around the parking lot to "see people," which was what "everybody does." (RR3: 127). When the men decided to leave, Martin crossed or cut through the parking lot and some parked cars to avoid a car that was stopped in a lane he wanted to use and ended up in front of the

---

[2] In his brief, Appellant misstates that he and Fernando both spent the evening at the bar. (Appellant's Br. p. 7). As discussed in more detail below, however, the record reflects Appellant spent the evening at a birthday party and merely drove to the Fiesta Supermarket parking lot across the street from the bar to pick up a friend. (RR7: 201-02, 204, 207).

[3] The Fiesta Supermarket provided parking for 2 One 6 and other neighborhood businesses. (RR3: 126-27; RR4: 120).

Fiesta, facing it. (RR3: 127, 151-52; RR4: 28). As Martin was making a right-hand turn to approach the exit to the parking lot, a blue Nissan Sentra, driven by Appellant, cut him off. (RR3: 127-30, 143, 152-57; RR4: 43, 133). The two cars nearly collided. (RR3: 128, 153, 155).

After the near-collision, Appellant pulled around to Martin's driver's-side window and stopped. (RR3: 128-30, 143, 155). The four men and Appellant started "cussing" at each other through the open windows of the cars, but none of the parties threatened to kill one another. (RR3: 128-30, 153-54). Martin recalled Appellant saying "something about Tango Blast this or something like that." (RR3: 156; RR7: 62).

At that point, all four men got out of the Charger and approached Appellant's open window. (RR3: 130, 155-56). Martin, Michael, and Gustavo gave different accounts as to whether they physically attacked Appellant; however, the evidence showed some punching and reaching through Appellant's open car windows probably occurred. (RR3: 156-57, 131; SX 67). In any event, the four men abandoned the altercation and thought the altercation was over. (RR7: 149). Gustavo said, "Just forget it. Let's get back in the car," or, "It's not worth it. Just keep it moving." (RR3: 130; RR4: 31; RR7: 155). None of the four men in the Charger had any weapons on their persons or in the car, and in particular, nothing under the seat. (RR3: 161;

4

RR4: 35). None of the parties made any "specific threats" to one another, and no one threatened to shoot Appellant. (RR3: 161; RR4: 35).

Appellant sped away; the men thought he had taken off. (RR3: 157). Gustavo, Martin, and Michael thought the altercation was over, and that "everything was good," so they got back into the Charger to leave. (RR3: 132-33, 157-58; RR4: 31). As the men were waiting for traffic to clear so they could exit the parking lot, "the next thing you know, we were getting struck in our window." (RR3: 132-33). As Martin started to put the car into gear, he glanced to his right and saw "somebody swinging in the car" through the passenger window. (RR3: 158). He thought someone was hitting Fernando. (RR3: 158). Appellant was "swinging … like a hook sideways" into the passenger-side windows of the car. (RR3: 133). Appellant swung into the back window "a little bit," but primarily swung into the front passenger window. (RR3: 133). Gustavo tried to get out of the car, but Appellant was "going back and forth" between the windows and "[t]here was no way" he could have exited. (RR3: 133-34).

Gustavo saw someone knock Appellant away from the car window. (RR3: 134-35). He, Martin, and Michael got out of the car and started hitting Appellant. (RR3: 134-35, 159). Gustavo heard someone say, "Fernando is stabbed." (RR3: 134). Gustavo ran to Fernando, who was standing by the front

5

passenger door and was "bleeding constantly," and held him and tried to stop the bleeding until medical personnel arrived. (RR3: 134-35, 140).

**Testimony of Balthasar Reyes**

Balthasar Reyes, a friend of Fernando, Gustavo, Martin, and Michael, hung out with them at the bar that night with another friend, Freddie Garcia. (RR4: 39, 44-45). Balthasar was an eyewitness to the murder and was the man who tackled Appellant as he was stabbing Fernando.[4] (RR4: 39, 44-45).

Balthasar was a passenger in a black Ford F150 truck in the Fiesta parking lot. (RR4: 40-43, 50). The driver had pulled over to the side of the parking lot to talk to some women. (RR4: 40-43, 50). There was not enough space to drive by the parked truck, but Appellant "kind of just wedged himself" around the truck, almost hitting the women, who screamed at him. (RR4: 42).

After Balthasar and his friend finished talking to the women and drove off, Balthasar glanced to his left and saw Appellant, who did not look afraid, run up to Martin's Charger. (RR4: 43, 53). Balthasar testified when Appellant approached the car, Fernando was looking forward and down, like he was looking at his phone. (RR4: 45). He saw Appellant run up to the back passenger window of his friends' car and "start swinging off inside the

---

[4] Balthasar did not witness an altercation occur in the bar. (RR3: 39). Freddie Garcia was interviewed by police, but did not testify at trial because the State was unable to locate him. (RR6: 33-34).

window." (RR4: 44). Balthasar did not see Fernando defend himself; Fernando looked like Appellant "caught him by surprise." (RR4: 45). As soon as Balthasar saw Appellant swinging, he believed Appellant was taking surprise advantage of his friends and was hitting them, so he got out of the truck and ran to help them; he did not know Appellant had a knife. (RR4: 43-45, 53).

Balthasar hit Appellant, kicked him about two or three times, and "[k]nocked him out." (RR4: 44-45). At that point, "[t]hat's when everybody started, you know, getting on him." (RR4: 46). Balthasar testified that Freddie Garcia was behind him, and he thought Freddie threw a beer can at Appellant. (RR4: 45). A police officer tried to grab Balthasar, but, in shock over what had just happened, he left the crime scene and police officers never interviewed him. (RR4: 47-48; RR6: 34-35).

**Testimony of Detective Eduardo Ibarra**

Dallas Police Detective Eduardo Ibarra, the lead detective in the case, investigated the murder scene. (RR4: 127, 129-30). Officers did not find any weapons at the crime scene other than the four-inch, black-handled Smith & Wesson knife responding officers took away from Appellant. (RR4: 122, 133, 162).

Detective Ibarra interviewed Appellant at the hospital the day after the murder. (RR4: 147-49). The State played the audio recording of the interview at trial, and the jury heard Appellant provide the detective with two versions of what happened that night. (RR4: 147, 152-53, 163, 166; SX 67). Appellant claimed he had driven to the Fiesta Supermarket parking lot to meet and pick up an intoxicated friend, Angel Cabrera, from 2 One 6. (RR4: 179; SX 67). Appellant stated that he never went inside the bar. (SX 67). Instead, he had been drinking at a party in Garland and had a partially-consumed 12-pack of beer in his car. (SX 67).

In his first version of the crime, Appellant told the detective he was driving through the Fiesta parking lot and another car almost ran into his car "right when I drove up." (SX 67). Appellant exclaimed to the driver, "Dude, you almost hit my car," and he exchanged some words with the driver and passengers through the open car windows. In particular, one passenger said, "Hey, fuck you, bitch, what's up?" and, "Fuck you, motherfucker. What's up?" (SX 67).

Appellant told the detective the man in the front passenger's seat jumped out of the car, came up to Appellant's open back driver's-side window, and grabbed and pulled the back of his shirt. Appellant jumped out of the car, and the man, a "real skinny guy," swung something at him that he guessed was a

knife; Appellant claimed he "blocked" the swing and the knife cut his arm. (SX 67). Appellant then told the detective he grabbed the knife away from the man and someone hit Appellant in the back with a bottle. (SX 67).

Appellant claimed when he got hit with the bottle, he "just started swinging … self-defensing myself … I had five dudes on me, man." (SX 67). He claimed he was "fighting with these two dudes," and "the next thing you know, somebody in the car hit me and I started swinging in the car." (SX 67). Then, all of the men in the car got out, he started to run back the three or four steps to his car, but was sprayed with mace; that was all he could remember except for his eyes burning and police yelling to get on the ground. (SX 67). He told the detective that if he hit the officers, it was because he was surrounded by "the other dudes" and was just swinging. (SX 67). He heard his ankle crack when "they threw me on the ground." (SX 67). Appellant told the detective he stood between the cars, but never got close to the other car and never approached the other car. (SX 67). Later during the 30-minute interview and later at trial, Appellant admitted this first version of the crime was a "bullshit" story and that it was false. (RR6: 192-95; SX 67).

After Detective Ibarra informed Appellant he had viewed a Fiesta parking lot surveillance recording of the murder and his story did not match the recorded evidence, Appellant provided the detective with a second version

of the crime.[5] (RR4: 148, 157, 159; SX 67). Appellant told the detective, "I was drunk," and his story immediately changed. (SX 67). He told the detective the men almost hit his car then "started talking shit." (SX 67). Appellant admitted it was possible he approached the men's car first and walked up to the passenger's side of the car, but he was drunk and did not remember because he blacked out. (RR4: 158, 160; SX 67). Appellant admitted he had a knife, which he described as a black Swiss Army knife. (RR4: 162; SX 67).

Appellant then told Detective Ibarra that he went up to the window by the driver's window. (SX 67). The driver "started going like he was going to grab his gun or something" and the "old boy" in the back seat tried to get out of the car. (SX 67). Appellant pulled his knife out when he saw the man "reach," and, "I stabbed him, I guess." (SX 67). Appellant told the detective he stabbed the driver, who was inside the car, and Detective Ibarra testified Appellant reacted with surprise upon learning he had, instead, stabbed the passenger. (RR4: 157-58, 161; SX 67). After he stabbed into the car, all of the men got out. (SX 67).

---

[5] The Fiesta Supermarket parking lot surveillance recording was not ready for Detective Ibarra to view before he interviewed Appellant; however, he told Appellant he had viewed it. (RR4: 158). Detective Ibarra explained proper police interrogation tactics allowed him to tell a person being interviewed he had evidence he did not, in fact, possess. (RR4: 158).

Appellant admitted that he "posted up," which is a slang term for, "Well, you stood there." (RR4: 157; SX 67). Without prompting, he also told Detective Ibarra, "I didn't say nothing about no 'hood," but Detective Ibarra told him witnesses heard him yelling, "Tango, Tango, Tango," and that none of the men could have been close enough to Appellant to see the Tango Blast prison gang tattoo on his neck. (SX 67). When Detective Ibarra asked Appellant why he got out of his car when he knew the other car had "four or five dudes" in it, all of whom were far younger than him, Appellant said "he" kept going on with this "bitch shit." (SX 67). He agreed he could have said, "Fuck it, I'm out of here," but he said if he turned around he could have been shot in the back or something. (SX 67). He told the detective he thought his life was in danger when the driver started reaching for whatever he was reaching for. (SX 67).

At the conclusion of the interview, Appellant gave permission to Detective Ibarra to tell his girlfriend, Shelly Hernandez, he "had messed up," to relay to her what had happened, and to tell her he was going to be "gone for a long time." (RR6: 122, 149; SX 67).

Although Detective Ibarra testified he believed Appellant was coherent and understood everything that was going on at the time of the hospital interview, Appellant attempted to discredit the detective's testimony about the

11

recorded statement as well as the Fiesta surveillance recording on cross-examination. (RR5: 6; RR6: 122, 142). Appellant's trial counsel attempted to portray Appellant, at the time of the hospital interview, as being under the influence of various pain medications and as having a possible brain injury from being hit in the head with a beer can; therefore, he argued, Appellant was unable to properly answer the detective's questions. (RR5: 8-9). Appellant contended his recorded statement was involuntary. (RR7: 186-88).

Detective Ibarra, however, testified Appellant was alert and coherent when he gave his statement, and "was not having any issue at all." (RR6: 120; RR7: 186-88). Detective Ibarra believed Appellant was "eager to talk about what had happened." (RR4: 150). Although the detective did not know what kind of pain medications Appellant was taking, if any, he appeared to understand all of the detective's questions, was not slurring his speech, did not have any trouble staying awake, and did not appear to be groggy. (RR6: 120-22). Appellant's ability to change his story when confronted with the truth indicated to the detective that Appellant was fully cognizant and able to understand what was going on during the interrogation. (RR6: 121-22).

Detective Ibarra also interviewed Martin, Michael, and Gustavo independently. (RR4: 127, 129-30, 146-47; RR5: 6; RR6: 37-38). None of the men reported an altercation had occurred with Appellant prior to the one

12

following the near-collision in front of the Fiesta; however, Detective Ibarra admitted the men could have lied to him about that fact. (RR4: 127, 129-30, 146-47; RR6: 46-47, 178). Nevertheless, regardless of that omission or any problems in the men's testimony regarding the timing of the verbal altercation and when it began did not "change the outcome," and Detective Ibarra still found the men's statements and testimony about the murder to be credible. (RR6: 62-63). Detective Ibarra believed the men's independently-taken statements were consistent with what he saw at the crime scene. (RR6: 37-38).

**The Recorded Jail Calls**

The jury heard the following portion of a recorded jail call between Appellant and his girlfriend, Shelly Hernandez, made the day after Appellant went to jail on June 25, 2013:

> Appellant: I went to pick up Angel. These motherfuckers jumped out of the car and started talking shit.
>
> Shelly: Where are you at? What are you facing? . . .
>
> Appellant: Murder.
>
> Shelly: I mean, you told them . . . did you say self-defense? What did you say?
>
> Appellant: *Yeah. That's what I'm saying. Self-defense. See how it comes out.*

(RR6: 120, 143-44; RR7: 234; SX 39, 6/25/14). In the call, Appellant did not mention to Shelly that anyone had reached for a gun or weapon. (RR6: 144-

13

45). The State also played several other jail calls in which Appellant advanced versions of what occurred that differed from the versions he provided to Detective Ibarra.[6] (RR6: 156-63, SX 14). Detective Ibarra testified that the versions on the jail calls added details that were not corroborated by the parking lot surveillance recording or witness statements. (RR6: 162).

**The Fiesta Surveillance Recording**

The State played for the jury the Fiesta Supermarket parking lot surveillance recording which depicted Appellant murdering Fernando; Detective Ibarra testified about the recording. (RR3: 135-37; RR4: 166-67; SX 17). In the recording, the jury saw the following: the initial near-collision in front of the Fiesta; the four men getting out of the Charger and standing at Appellant's driver's window; and all four men returning unharmed to the car. (SX 17). As Appellant is driving away, the four men are getting into the Charger. (SX 17). About seven seconds after Appellant drives away, and as the four men are still getting into their car and closing their doors, Appellant quickly parks a short distance away in the traffic aisle, jumps out, and runs back to the Charger. (SX 67). He first leans into the back passenger window

---

[6] For example, in a call placed on June 29, 2013, Appellant tells his conversant that the men in the Charger almost ran into the back of his car, an altercation occurred, they threatened to shoot him in the back, and then, "I beat everybody up in the car, and, like, fucking, like 13 people up in the club and shit." (RR6: 164; SX 14, 6/29/2013 21:42:45).

14

and then into the front passenger car window, making stabbing motions. (RR4: 168-69; SX 17).

Detective Ibarra did not see anything in the recording showing Appellant was impeded from leaving right after the cars almost collided. (RR4: 167). The detective testified the manner in which Appellant re-approached the car and immediately began stabbing the right front passenger belied his statement that he looked into the car, saw someone "reaching for something," and stabbed in self-defense. (RR4: 169).

**Testimony of the Medical Examiner**

A Dallas County medical examiner, Dr. Elizabeth Ventura, testified about her autopsy of Fernando. (RR3: 95, 97). Fernando had one stab wound on his neck, which transected his esophagus and trachea, penetrated his thyroid gland, and nicked a vertebrae; one on his right chest, which penetrated his diaphragm and liver; one on his right shoulder; and one on his right cheek. (RR3: 101, 104). In addition, he had three incised wounds—wounds which are longer on the skin than they are deep—two on the right side of his neck and one on the fifth finger of his left hand. (RR3: 101, 104-05). Dr. Ventura stated that the cause of Fernando's death was stab wounds, particularly the two deep wounds to the neck and chest. (RR3: 115-16).

15

**Appellant's Self-Defense Theory**

Appellant testified that, on the evening leading up to the murder, he left a birthday party at 11:45 p.m. and went home. (RR7: 182, 201-02). He had consumed alcohol at the party and had just started drinking a 12-pack of beer when an intoxicated friend, Angel Cabrera, called him from the 2 One 6 bar and asked for a ride. (RR7: 201-02, 259-60). Appellant testified he "was buzzing good"; however, despite being "heavy duty" intoxicated, he believed he was able to clearly remember the events that occurred that night.[7] (RR7: 260-61).

Appellant testified he drove his girlfriend's Nissan Sentra to the Fiesta parking lot to pick up Angel with the remainder of the 12-pack of beer in tow.[8] (RR7: 202, 204, 207, 259-60, 279-80). Appellant claimed that his near-collision with Martin's Charger in the parking lot as captured on the Fiesta surveillance recording was not the parties' first encounter that night. (RR7: 254). Instead,

---

[7] When he arrived at the hospital from the crime scene, Appellant's blood-alcohol content was .17, which is more than twice the legal limit. (RR7: 260). Appellant admitted that was a "heavy duty" buzz for him. (RR7: 260).

[8] Angel Cabrera testified for the defense. (RR4: 179). Angel testified that he was at 2 One 6 on the night of the murder. (RR4: 179). Angel called Appellant and asked him to pick him up from the bar because he was intoxicated. (RR4: 180). Angel did not witness the murder. (RR4: 182). Appellant did not pick Angel up, and he did not have any further contact with Angel that night. (RR7: 210-11).

16

the altercation began, not when his car and Martin's nearly collided, but when Martin tapped the rear bumper of Appellant's car with his car. (RR7: 254).

Appellant claimed while he was stopped in an aisle of the parking lot waiting for a truck to back out, he felt "someone bump" the rear bumper of his car. (RR7: 206). Appellant got out of his car and went to the back of it where Martin's car was "up on my bumper." (RR7: 207). Appellant claimed he asked Martin to move back to see if his bumper was damaged, but Martin would not do so. (RR7: 207). An altercation ensued, which involved foul language, including, "Bitch, motherfucker, this and that." (RR7: 208). Appellant testified at one point the driver told Appellant, "Get the fuck away from my car," and "was reaching up under the seat, like if he had a gun or something," and "someone said [to] shoot me." (RR7: 265). Appellant got in his car and "took off." (RR7: 209-10). Appellant testified he thought the men in the car had a gun, but he never saw a weapon. (RR7: 210).

Appellant testified after he "took off" from the encounter with the men, he made a U-turn and was faced head-on and blinded by bright headlights from another car. (RR7: 210-12). He claimed he did not know the men in the car were the men he had just argued with until he pulled up next to the driver's window. (RR7: 211, 213, 251). Although he could have kept on driving, due to the men's hand gestures and body language, "[i]t looked … like they wanted to

17

say something," so he stopped his car next to theirs. (RR7: 213-15, 252). Appellant claimed he did not have any idea what the men's problem was because, at that point, "all it had been was words." (RR7: 214).

When Appellant stopped his car next to the Charger, the men immediately jumped out and approached his car. (RR7: 214, 252). Appellant did not know why they jumped out and had no idea what was going through their minds. (RR7: 214). He testified one of them called him a "[b]itch ass motherfucker" and "hoe ass motherfucker" and someone tugged on the back of his shirt. (RR7: 215). Appellant believed someone was trying to get in his car because someone tried to open his car door; he grabbed the door, closed it, and reached for his gear shift. (RR7: 215-16). He claimed that all four men were "swinging at [him]" with arms coming through the windows punching him, and he was hit four times. (RR7: 216-17, 258).

Appellant started to drive away. (RR7: 218). He claimed as he did so, he heard someone say, "We'll get him down the block. Get in the car. We'll get him down the block." (RR7: 218). Appellant claimed the men used the word "shooting" and "made a gesture as if they had a gun." (RR7: 219). He did not know which of the four men made the threat. (RR7: 217-18).

Appellant thought the men were "going to come get [him]." (RR7: 219). As he was driving away down the aisle of the parking lot, another car was

18

backing out in front of him and others were positioned to his left in a way that made him feel "trapped in," so he did not believe he could exit the parking lot. (RR7: 222-24). Appellant pulled his car only about a car-and-a-half length from Martin's car before stopping only about seven seconds later. (RR7: 258; SX 67). Appellant claimed he was not aware of whether he could exit the parking lot to his right, because he "was watching the guys behind me." (RR7: 225). He testified about why he stabbed Fernando as follows:

> [Defense Counsel]: Was there anywhere where you felt like you could go in that instant?
>
> [Appellant]: That instant? Nope. Because I –
>
> [Defense Counsel]: What did you do then?
>
> [Appellant]: I really wasn't paying attention to my right. I was watching the guys behind me.
>
> [Defense Counsel]: What did you do in that instant?
>
> [Appellant]: Jumped out of my car.
>
> [Defense Counsel]: Why?
>
> [Appellant]: Because I felt my life was in danger.
>
> [Defense Counsel]: And what did you do then?
>
> [Appellant]: Ran back up to the car.
>
> [Defense Counsel]: And what did you do then?
>
> [Appellant]: When I was running back – when I – when I got out of my car, the passenger looked at me. When – when I –

19

when we met eyes with each other, when he – when we saw each other, he reached up under his seat like he was going for something. That's – I was already running.

[Defense Counsel]: And you stabbed him?

[Appellant]: Yes, sir.
…

[Defense Counsel]: Why did you stab him?

[Appellant]: Because he was reaching for whatever he had under his seat.

[Defense Counsel]: Did you feel like you had any other options at that moment?

[Appellant]: Nope.

[Defense Counsel]: Did you feel like there was a way for you to escape?

[Appellant]:  Nope.

[Defense Counsel]: What was going through your mind in regards to the events that had just taken place in the last minute and a half?

…

[Appellant]: That they were already trying to do harm to me. I was going to protect myself.

[Defense Counsel]: Did you feel like your life was in danger?

[Appellant]: Yes. I felt like my life was in danger.

[Defense Counsel]: Did you feel like you could not get away?

[Appellant]: I felt blocked in.

(RR7: 225-27). Appellant testified as he was driving away he felt he had no other option than to "get out and go back and fight it out." (RR7: 227, 268). He agreed with defense counsel that "it was them or [me]." (RR7: 227). He claimed he did not intend to kill Fernando, only to protect himself. (RR7: 227).

He also agreed on cross-examination that he did not tell Detective Ibarra at the hospital that anyone "tapped" the back of his car before the near-collision in front of the Fiesta or that anyone threatened to shoot him. (RR7: 240). He agreed that he made up "some bullshit," and told the detective, when confronted by information that a recording of the crime existed, that he was drunk. (RR7: 240-41).

Appellant agreed that he waited until all four of the men were back in the car with their backs to him before he started running toward the front passenger. (RR7: 258-59). He claimed, however, that the passenger, Fernando, looked at him. (RR7: 259, 262). Appellant claimed that, as he got out of his car, Fernando reached under his seat. (RR7: 259). Although he told someone on a later jail call that someone yelled, "Go ahead and pull it. Come on. If you're going to pull it, pull it," he testified that was not true and "was talking out of the mouth" at that time. (RR7: 259).

21

Appellant also claimed he did not know why the men reported to the police that he identified himself to them as a Tango Blast prison gang member or how the men in the car knew he was a member of Tango Blast. (RR7: 243). His explanation was the men could have seen the tattoo on the right side of his neck even though the tattoo was hidden under the collared shirt he was wearing that night, and even though only the left side of his neck was facing the men as he stabbed through the window. (RR7: 243-44). He testified the shirt was not buttoned up all the way. (RR7: 243-44).

**Testimony of Isabella Armadillo**

Appellant presented the testimony of Isabella Armadillo, who was at 2 One 6 on the night of the offense, was in the Fiesta parking lot after the bar closed, and saw the near-collision. (RR7: 271, 273, 275, 279). She testified she saw the two cars stop side by side and four men immediately get out. (RR7: 276). All of the men started punching through the window of the other car. (RR7: 277).

Armadillo then saw the Nissan move forward a little and saw the driver get out; she thought the driver was punching through the window and did not know he was stabbing the passenger. (RR7: 277-78). When Armadillo saw the police arrive, she pulled to the other side of the parking lot to talk to some men. (RR7: 278-79). She did not talk with police because she was scared, had

22

been drinking, was driving, and did not want to get involved. (RR7: 280-81, 285). She found out later that someone had died, and made a post on a social media website that she had seen a man "getting jumped by four guys … [a]nd then got off and started stabbing. … Self-defense in my eyes." (RR7: 279, 283; DX 17). Armadillo did not see any weapons, did not see anyone stab Appellant, and did not hear anyone threaten to shoot Appellant. (RR7: 286). Armadillo provided no evidence as to whether Appellant acted in self-defense.

## SUMMARY OF ARGUMENT

Appellant was not entitled to a jury instruction on self-defense because *no evidence* was presented at trial raising the issue; hence, the trial court did not abuse its discretion by including an instruction on provocation in the jury charge. In the alternative, if this Court finds Appellant was entitled to a self-defense instruction, the trial court did not abuse its discretion by instructing the jury on provocation.

23

# ARGUMENT

## RESPONSE TO APPELLANT'S SOLE SSUE

APPELLANT WAS NOT ENTITLED TO A JURY INSTRUCTION ON SELF-DEFENSE BECAUSE THE EVIDENCE DID NOT RAISE THE ISSUE; HENCE, THE TRIAL COURT DID NOT ERR IN INCLUDING A PROVOCATION INSTRUCTION IN THE JURY CHARGE.

IN THE ALTERNATIVE, THE TRIAL COURT DID NOT ABUSE ITS DISCRETION BY INCLUDING A PROVOCATION INSTRUCTION IN THE JURY CHARGE.

Appellant contends that the trial court abused its discretion by overruling his objection to the inclusion of an instruction on the doctrine of provocation in the jury charge. His contention is without merit.

## Relevant Facts

The jury charge included an instruction on self-defense, to which Appellant did not object. (RR8: 6-8; CR: 199-200). During the jury charge conference, however, Appellant's trial counsel objected to the following provocation instruction included in the charge:

> The use of force against another is not justified in response to verbal provocation alone, or if the actor provoked the other's use or attempted use of unlawful force, unless the actor abandons the encounter or clearly communicates to the other his intent to do so reasonably believing he cannot safely abandon the encounter and the other, nevertheless, continues or attempts to use unlawful force against the actor.

24

(RR8: 6; CR: 201-02). Trial counsel argued no evidence was raised at trial indicating Appellant provoked the four men's use or attempted use of unlawful force, and the instruction would "leave the jury with a false impression that [Appellant] was the original aggressor." (RR8: 6, 8). The trial court overruled his objection. (RR8: 8).

### Standard of Review and Applicable Law

When an appellant alleges jury-charge error on appeal, the reviewing court first determines whether error exists in the charge. *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005). If no error occurred, the appellate court's analysis ends. *Id.* If the charge is erroneous, the court analyzes the error for harm. *Id.*

A person commits murder when he intentionally or knowingly causes the death of an individual. *See* Tex. Penal Code Ann. § 19.02(b)(1) (West 2011). Under certain circumstances, however, self-defense justifies the use of deadly force. *Morales v. State*, 357 S.W.3d 1, 7 (Tex. Crim. App. 2011). A person is justified in using deadly force against another if 1) he would be justified in using force against the other under section 9.31 of the penal code, and 2) when and to the degree he reasonably believes the deadly force is immediately necessary to protect himself against the other's use or attempted

25

use of unlawful deadly force. Tex. Penal Code Ann. § 9.32(a)(1), (a)(2)(A) (West 2011). Section 9.31 of the penal code justifies force "when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force." *Id.* § 9.31(a) (West 2011).

To determine whether a defensive theory, such as self-defense, is raised, the evidence is viewed in the light most favorable to the defense. *Granger v. State*, 3 S.W.3d 36, 38 (Tex. Crim. App. 1999). If the evidence raises the issue of self-defense, the defendant is entitled to a jury instruction on that issue. *Dyson v. State,* 672 S.W.2d 460, 463 (Tex. Crim. App. 1984). If the testimony or other evidence viewed in a light most favorable to the defendant does not establish self-defense, an instruction is not required. *See* Tex. Penal Code Ann. § 2.03(c) (West 2011); *Granger*, 3 S.W.3d at 38. "The defendant's testimony alone may be sufficient to raise a defensive theory requiring a charge." *Dyson*, 672 S.W.2d at 463. A defendant is entitled to a self-defense instruction regardless as to whether the evidence of the defense is "strong, feeble, unimpeached, or contradicted," and even if the trial court does not believe the evidence or testimony is unbelievable. *Id.* (quoting *Warren v. State*, 565 S.W.2d 931, 933 (Tex. Crim. App. 1979)).

## Appellant was not Entitled to a Jury Instruction on Self-Defense

Because Appellant used deadly force against Leonardo, Appellant had to present evidence at trial showing 1) he would have been justified in using force, and 2) he reasonably believed the use of deadly force was immediately necessary to protect himself against Leonardo's use or attempted use of unlawful deadly force. *See* Tex. Penal Code Ann. § 9.32(a). Viewing the facts of the case in the light most favorable to a self-defense theory, the record contains *no evidence* Appellant was entitled to a jury instruction on self-defense.

In *McCoy v. State*, an assault case, this Court determined that the trial court did not abuse its discretion in overruling McCoy's trial request for a lack of a duty to retreat instruction as it related to self-defense. *McCoy,* No. 05-14-00227-CR, 2015 Tex. App. LEXIS 5202, at *6 (Tex. App.—Dallas May 21, 2015, no pet. h.) (mem. op., not designated for publication). This Court held *no evidence* in the record showed McCoy reasonably believed force was immediately necessary to protect himself from the victim's use or attempted use of unlawful force. *Id.* The witnesses described the victim's behavior as "not friendly," "threatening," "aggressive," and "physically intimidating." *Id.* The Court found these descriptions, however, were mere conclusions that did not constitute evidence McCoy reasonably believed force was immediately necessary to protect himself from the victim's use or attempted use of unlawful

force. *Id.* Hence, McCoy was not even entitled to a self-defense charge and the trial court did not err in omitting McCoy's requested instruction. *Id.*

Likewise, in this case, Appellant was not entitled to an instruction on self-defense. The record contains *no evidence* Appellant reasonably believed deadly force was immediately necessary to protect himself from the use or attempted use of unlawful deadly force by any of the four men. Appellant, by his own admission, drove away from the altercation after the near-collision. If the jury believed Appellant's testimony, he heard one of the men, as he was driving away from the altercation, say, "We'll get him down the block. Get in the car. We'll get him down the block." He heard the men use the word "shooting," and one "made a gesture as if they had a gun." Appellant admitted that he waited until all four of the men were back in the car with their backs turned to him before he stopped his car, got out, and ran toward the front passenger. The Fiesta surveillance recording as well as the testimonies of Martin, Michael, and Gustavo, corroborated this evidence.[9] Appellant's testimony was he only thought the men were "going to come get" him at some point "down the block"; he did not testify that they were immediately chasing

---

[9] As mentioned in the facts above, a review of the surveillance recording shows that Appellant got out of his car and started running toward the Charger as the men had their backs to him and were actually in the process of getting into their car. Appellant arrived at the car as all men had just closed the car doors. (SX 67).

28

him or threatening him with a gun. Appellant did not see anyone threatening him with a gun or other weapon at any time.

Appellant testified during the approximately seven seconds that elapsed between him driving away, parking, and getting out of his car, he encountered cars that were positioned to his left that made him feel "trapped in." Appellant's testimony that he acted in self-defense because he felt trapped, threatened, and feared for his life, however, was conclusory. He provided *no facts* showing the four men were immediately pursuing him and using or attempting to use deadly force against him. Instead, the evidence conclusively proved the men were preparing to drive away and had not displayed any weapons to Appellant when he made his decision to re-approach their car. Appellant's fear of what the men may do at a later time "down the block" was not evidence that the four men were using or attempting to use deadly force that justified Appellant's immediate use of deadly force. *See McCoy,* 2015 Tex. App. LEXIS 5202, at *6.

Moreover, Appellant admitted he returned to an altercation that all parties had abandoned to "fight it out." Tellingly, Appellant admitted that his initial self-defense story to Detective Ibarra in his hospital interview was "bullshit," and his testimony at trial was an obvious attempt to raise the defensive issue. Appellant's own testimony proved he formulated the intent to

get out and return to the Charger "to fight it out," even though the altercation had ended and none of the men were using or attempting to use deadly force against him at that time. By Appellant's own admission, Fernando did not "reach" under his seat for "something" until after Appellant had re-initiated the confrontation by exiting his car and running to the Charger. Appellant testified as he was running to the car, Fernando looked at him and "reached under his seat like he was going for something," so Appellant stabbed him multiple times. The direct evidence on the Fiesta surveillance showed Appellant leaning into the back passenger seat first before leaning in and stabbing Fernando. A person is not allowed to abandon an altercation, return to re-instigate it, and then claim self-defense. *See* Tex. Penal Code Ann. § 9.31(b)(4); *Dyson,* 672 S.W.2d at 464 (holding where Dyson's stated intent was to provoke the victim into a fight, he foreclosed his right to self-defense); *see also Reese v. State*, No. 02-10-00143-CR, 2011 Tex. App. LEXIS 5445, at \*13 (Tex. App.—Fort Worth July 14, 2011, no pet.) (mem. op., not designated for publication) (citing Tex. Penal Code Ann. section 9.31(b)(4), and holding the jury was entitled to conclude Reese did not act in self-defense where the undisputed evidence reflected the initial confrontation between the parties had ended, Reese returned to his apartment, got a gun, reinitiated the confrontation, and shot toward the victim).

The record is devoid of any evidence that, when Appellant got out of his car and re-initiated the altercation, the four men who were in the Charger with their backs turned toward him were actually using or attempting to use unlawful deadly force against him; he only believed the four men were going to pursue him and shoot him "down the block" at some point in the future. Even if the jury were to believe Appellant's testimony that he believed Fernando reached for a weapon, Appellant's own testimony established Fernando did not reach for anything until after Appellant had exited his car with a knife and was making his attack. The record does not contain a scintilla of evidence that Appellant acted in self-defense. *See McCoy*, 2015 Tex. App. LEXIS 5202, at *6; *Ruiz v. State*, No. 05-06-00415-CR, 2007 Tex. App. LEXIS 596, at *8-9 (Tex. App.—Dallas Jan. 29, 2007, pet. dism'd) (not designated for publication) (finding self-defense was not raised when there was no evidence victim used or attempted to use unlawful force, despite evidence that defendant believed he was defending himself, victim "scared the hell out of" defendant, and victim "came at" defendant).

Because he was not entitled to a jury instruction on self-defense, the trial court did not err by including a definition of provocation in the jury charge.[10]

---

[10] The State notes because the evidence did not raise the issue of self-defense, Appellant only benefitted by having an undeserved defensive issue for the jury to consider.

*See McCoy*, 2015 Tex. App. LEXIS 5202, at *6. The Court should overrule Appellant's sole issue on this basis.

## Alternatively, the Provocation Instruction was not Erroneous

For the sake of argument, and if this Court determines Appellant was entitled to a self-defense jury instruction, the trial court did not abuse its discretion in submitting a provocation instruction to the jury. A defendant may forfeit his right to self-defense if he provokes the attack. *Smith v. State*, 965 S.W.2d 509, 512 (Tex. Crim. App. 1998). An instruction on the issue of provocation, in answer to a defendant's claim of self-defense, is appropriate when there is sufficient evidence 1) that the defendant did some act or used some words which provoked the attack on him; 2) that such act or words were reasonably calculated to provoke the attack; and 3) that the act was done or the words were used for the purpose and with the intent that the defendant would have a pretext for inflicting harm on the other. *Id.* at 513. All of the elements are questions of fact. *Id.* An appellate court's inquiry is whether "a rational jury could have found provocation beyond a reasonable doubt, viewing the evidence in the light most favorable to giving the instruction." *Id.* at 514; *Mendoza v. State*, 349 S.W.3d 273, 279 (Tex. App.—Dallas 2011, pet. ref'd).

In determining whether the evidence supports the trial court's inclusion of the provocation instruction, the appellate court reviews the record in the

light most favorable to the instruction, deferring to the jury's determinations as to credibility and weight because the jury is the sole judge of the witnesses' credibility and the weight to be given their testimony. *Smith*, 965 S.W.2d at 514. An appellate court is not to decide whether the "evidence actually established that the appellant provoked the difficulty with the intent to harm the deceased." *Id.* at 519-20. Rather, that matter is for the jury. *Id.* The State does not have to prove the exact words or acts that provoked the attack; rather, "the jury must merely be able to find that there was *some* provoking act or words." *Id.* at 515.

Appellant profoundly oversimplifies the evidence of provocation in this case, stating the only evidence in the record of him provoking Fernando was "looking at [the complainant and his friends] the wrong way." (Appellant's Br. p. 7, 12). Instead, viewed in the light most favorable to giving the instruction, the record reveals that Appellant provoked the men, and in particular Fernando's alleged "reaching" for "something," when he parked his car and ran back to the Charger only seven seconds after the altercation over the near-collision had ended, satisfying the first element of provocation, which requires the defendant to do some act or use some words to provoke the attack. *See Smith,* 965 S.W.2d at 514.

In a distinguishable case, *Mendoza v. State*, this Court determined that the trial court erred in giving a provocation instruction where the State and Mendoza provided two conflicting and irreconcilable stories of what happened at the crime scene, neither of which reflected that any words or acts by Mendoza caused the victim to attack him. *Mendoza*, 349 S.W.3d at 279. The State's evidence showed the victim told a witness Mendoza pulled a knife on him during an argument, Mendoza left the house and walked to the middle of the street and stopped. *Id.* The witness saw the victim sit down by the door. The witness did not provide any testimony about how any fight actually started. *Id.* No one saw Mendoza stab the victim, but later the victim was found stabbed to death in the yard, and Mendoza admitted that he stabbed him. *Id.* at 275, 277.

Mendoza claimed he acted in self-defense. *Id.* at 277. According to Mendoza, the victim pulled a knife on him in the house, he went outside, the victim followed him with the knife, and attacked him with no provocation and for no reason. *Id.* at 279. The trial court instructed the jury on the issue of provocation. *Id.* at 278.

On appeal, Mendoza alleged that the trial court erred in including the provocation instruction in the jury charge over his objection. *Id.* at 277. The State argued, in part, that, after pulling a knife on the victim in the house,

Mendoza left the house, came back, and killed the victim; hence, Mendoza's return to the scene was, in and of itself, a provocative act. *Id.* at 280. This Court, however, found with no evidence in the record as to what occurred upon Mendoza's return to the scene after standing in the street, and no evidence in the record that the victim attacked or attempted to attack Mendoza because of a provocative word or act by Mendoza, the first causation element failed. *Id.* at 281. This Court concluded, therefore, the trial court erred by including the instruction in the jury charge. *Id.*

Viewing the evidence in the light most favorable to the instruction, unlike the facts in *Mendoza*, the facts in this case, if Appellant's testimony is to be believed, reflect Fernando "reached" for "something" under his seat because of Appellant's provocative act of running back to the Charger with a knife mere seconds after their altercation had ended.[11] The jury had before it evidence through the Fiesta surveillance recording, the testimonies of Michael, Martin, and Gustavo, as well as Appellant's own testimony, that the parties were involved in an altercation before the stabbing. Regardless of whether the altercation began off-camera with Martin "tapping" Appellant's bumper or

---

[11] Appellant provided the only evidence that Fernando made a reaching motion under the seat. Balthasar testified he did not see Fernando reach for anything—he testified Fernando was looking straight ahead as if he was looking at his phone. The Fiesta parking lot surveillance does not reflect Fernando reaching. (SX 67).

with the near-collision caught on the Fiesta surveillance recording, the evidence definitively proved an altercation occurred in front of the supermarket when the two cars nearly collided. During the altercation or altercations, the four men called Appellant, among other things, a "bitch," and possibly threatened to shoot him with a gun, although no gun was found at the scene and Appellant admitted he never saw a gun.

All parties, *including Appellant*, testified Appellant drove away from the altercation unscathed; Gustavo, Martin, and Michael believed the altercation was over. The Fiesta parking lot surveillance recording corroborated the testimony. Although Appellant did not see a gun, he believed the men had a gun in the car and planned to shoot him "down the block," in the future, but not immediately. Instead of leaving the scene as he could have done, in the few moments he spent driving one-and-a-half car lengths away from the Charger, by Appellant's own testimony, he formulated his intent to get out of the car to "fight it out" because he felt "trapped." Despite the four men obviously having abandoned the disagreement for the time being, Appellant armed himself with a knife and exited his car to fight the men, even though he did not see anyone threatening him with a gun or weapon.

Appellant admitted that he waited until all of the men were back in the Charger with their backs turned before he got out of his car. Appellant's own

36

testimony was Fernando reacted to him getting out and running to the Charger by reaching under the seat as if to "grab something," and Appellant thought he was reaching for a gun; hence, he stabbed him.

Appellant's stated intent was to return to the car to fight the men. If Appellant's testimony is to be believed, he only perceived Fernando's alleged attempted use of deadly force after he made the decision to return to the Charger and was in the act of exiting his car; hence, a rational jury could have found his act provoked any "reaching" by Fernando. A rational jury could have determined Appellant's return to the Charger to re-initiate a fight that was over was an act of provocation, and the trial court did not abuse its discretion in including the instruction in the jury charge. *See Acosta v. State,* No. 05-11-01165-CR, 2013 Tex. App. LEXIS 1966, at *9-10 (Tex. App.—Dallas Feb. 27, 2013, no pet.) (mem. op., not designated for publication) (holding trial court did not err in including provocation instruction in the jury charge where the evidence showed Acosta and the victim had a history of animosity, Acosta left an altercation with the victim and returned ten minutes later with a knife, because jury could have inferred Acosta knew the victim would "go after her" if she returned); *Rubio v. State*, No. 05-10-00583-CR, 2011 Tex. App. LEXIS 9326, at *11 (Tex. App.—Dallas Nov. 29, 2011, pet. ref'd) (not designated for publication) (holding trial court did not err in submitting provocation

instruction to jury where evidence showed Rubio returned with a gun to a location he knew victim, with whom he had been involved in prior altercations, would be, intending to have a confrontation with the victim, and stating, "Either he kills me or I kill him once and for all.").

As to the second element, Appellant's act in approaching the Charger with a knife was reasonably calculated to provoke the attack.[12] A jury may rely on circumstantial evidence to find beyond a reasonable doubt that a defendant's actions and words were reasonably capable of or had a reasonable tendency to cause an attack. *Smith*, 965 S.W.2d at 512. Here, the evidence showed the parties had been in involved in one, if not two, heated altercations before the stabbing, exchanging verbal insults and possibly threats of physical violence. The jury could have inferred from the parties' brief history Appellant knew and intended any overtly aggressive act by him, such as charging at the men's car when their backs were turned and the altercation was supposedly over, would cause a volatile reaction from any one of the men. *See Smith*, 965 S.W.2d at 517-19 (holding the evidence showed Smith's abusive language was reasonably calculated to cause the victim to attack him where Smith and a

---

[12] Appellant alleges the first provocation element, which "triggers the inquiry into whether the issue of provocation may be present in the case," fails, hence, the second and third necessarily were not satisfied, and he makes no additional analysis as to the second and third elements of provocation. (Appellant's Br. p. 13).

third party were in an argument, the victim intervened and showed a knife, and evidence showed Smith's continued exchanges with the third party had a volatile effect on the victim and would have caused the victim to attack Smith).

As to the third element of provocation, Appellant returned to the car to re-instigate the altercation for the purpose and with the intent to inflict harm on one of the men in the car. Appellant testified he knew the fight was, for the moment, over. Appellant acknowledged several times that he had driven away. He did not see the men with weapons, they were getting into their car, and they were not immediately pursuing him; his testimony was he feared they would shoot him "down the block" at some later time. Although he felt "trapped" or "blocked in" in his traffic lane, the jury saw the recorded surveillance and saw that no cars were blocking Appellant's car, and he could have turned left or right out of his parking lot aisle. Detective Ibarra testified he saw no cars blocking Appellant's way. Moreover, Appellant formulated this alleged feeling of being trapped mere seconds after he drove away, which the jury could have determined was irrational and unreasonable or a falsehood.

The jury could have inferred from the evidence that Appellant's real reason for returning to the Charger was his desire to retaliate. Appellant stated to Detective Ibarra during the hospital interview that one of the reasons he got out of the car, which he knew was "four-deep" with men who he claimed he

thought may have had a gun, was because they were "going on with this bitch shit." Appellant's return to a car full of men with whom he had just argued, and who he allegedly believed had a gun, while carrying a knife showed the jury Appellant's great anger at being disrespected and indicated his intent to return to the car as a pretext to retaliate against the men he thought had disrespected him. *See Gill v. State*, No. 01-98-00674-CR, 1999 Tex. App. LEXIS 6691, at *2 (Tex. App.—Houston [1st Dist.] Sept. 2, 1999, pet. ref'd) (not designated for publication) (finding evidence of intent of creating pretext for shooting when defendant retrieved pistol from her vehicle, pursued victim, shot her from behind, and stated, "Man, I told that bitch not to be fucking with me.").

Moreover, Appellant "overkilled" Fernando, showing his intent to inflict harm on him. Appellant returned to the Charger with a knife, which he used to inflict vicious, fatal stab wounds to Fernando, one of which was so deep it transected his esophagus and trachea, penetrated his thyroid gland, and nicked a vertebrae, another which was so deep it penetrated his diaphragm and liver. *See Smith,* 965 S.W.2d at 519 (citing *Matthews v. State*, 708 S.W.2d 835, 838 (Tex. Crim. App. 1986) for the proposition that evidence defendant stabbed victim twenty-four times is considered in establishing intent).

40

Finally, the evidence showed Appellant was a member of a prison gang, Tango Blast. He yelled, "Tango, Tango, Tango," during the altercation. The jury could have inferred Appellant's identification of himself as a Tango Blast gang member indicated he intended to re-initiate the altercation so he could resort to violence. *See Vasquez v. State*, 67 S.W.3d 229, 239-40 (Tex. Crim. App. 2002) (concluding evidence of Vasquez's gang membership established a motive for violence and was admissible to establish a connection between him and a gang-related crime).

Appellant completely omits from his brief most of the evidence of the altercation that was adduced at trial, and mischaracterizes the heatedness of the exchange among the parties. A proper, thorough review of the evidence in the light most favorable to the provocation instruction reveals a rational jury could have found Appellant provoked the four men, in particular Fernando, to attack him, that his return to the car was reasonably calculated to provoke the attack, and was done with the purpose and intent to create a pretext for harming one of the men in the car. This Court should conclude that a rational jury could have found every element of provocation beyond a reasonable doubt, and should overrule Appellant's sole issue on this basis.

## No Harm Demonstrated

For the sake of argument, if this Court determines the trial court erred in including the provocation instruction in the jury charge, Appellant was not harmed by it. If the appellant properly objected to the error in the trial court, as Appellant did in this case, the test for harm is whether the error was calculated to injure the appellant's rights, or, in other words, whether the appellant suffered "some harm" from the error. *Jimenez v. State*, 32 S.W.3d 233, 237 (Tex. Crim. App. 2000); *see also Ngo*, 175 S.W.3d at 743. This means that there must be *some* actual harm to the accused from the error. *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g); *Mendoza*, 349 S.W.3d at 281.

Under the "some harm" test, any harm, regardless of degree, is sufficient to require reversal. *Hutch v. State*, 922 S.W.2d 166, 171 (Tex. Crim. App. 1996). In determining harm, the appellate court considers the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the arguments of counsel, and any other relevant information revealed by the whole trial record. *Almanza* 686 S.W.2d at 171. The harm question to be answered is "whether, in the absence of the provocation instruction, there would have been any chance that the jury would have found that [the appellant] acted in self-defense." *Mendoza*, 349 S.W.3d at

282. Significant evidence militating against a defense-requested instruction or finding can render an error harmless. *Medina v. State*, 7 S.W.3d 633, 642-43 (Tex. Crim. App. 1999).

As discussed above, the evidence conclusively proved that Appellant did not act in self-defense. There was no chance that the jury would have found Appellant acted in self-defense. A break occurred in the altercation, and Appellant re-instigated it—without being threatened by the four men's use or attempted use of deadly force—with the sole reason that he wanted to retaliate. The evidence that Appellant did not act in self-defense was so overwhelming and conclusive that he could not have been harmed by any erroneous provocation instruction. *See id.*

## STATE'S CROSS-POINT

THE TRIAL COURT SHOULD MODIFY THE JUDGMENT TO REFLECT APPELLANT'S PLEAS OF NOT TRUE TO THE ENHANCEMENT ALLEGATIONS AND TO REFLECT THE JURY'S FINDINGS OF TRUE.

The State alleged in the indictment that Appellant had a prior conviction for the felony offense of aggravated assault in Dallas County cause number F00-48000, dated June 16, 2000. (RR8: 64-65, CR: 10). The State also alleged, in a Notice of Intent to Enhance Punishment Range with Prior Felony Conviction, that Appellant had a prior conviction for felon in possession of a firearm in cause number 3-07-CR-114-D(01) from the Northern District Court

43

of Texas. (RR8: 64; CR: 51). Appellant pled not true to those allegations, but the jury found them to be true. (RR8: 64-65; RR9: 57; CR: 216).

Despite Appellant's plea and the jury's findings, the judgment in the case incorrectly lists "N/A" as Appellant's pleas to the first and second enhancement paragraphs and "N/A" as the jury's findings. (CR: 226). This Court has the power to modify an incorrect judgment to make the record speak the truth when it has the necessary information before it to do so. *See* Tex. R. App. P. 43.2(b); *Bigley v. State*, 865 S.W.2d 26, 27-28 (Tex. Crim. App. 1993); *Asberry v. State*, 813 S.W.2d 526, 529-30 (Tex. App.—Dallas 1991, pet. ref'd). Here, this Court has the necessary information to correct the judgment, and the State respectfully requests this Court to modify the trial court's judgment to reflect Appellant's pleas of not true and the jury's findings of true.

## PRAYER

The State prays that this Honorable Court will affirm the trial court's judgment, as modified.

Respectfully submitted,

/s/ Marisa Elmore

| | |
|---|---|
| Susan Hawk | Marisa Elmore |
| *Criminal District Attorney* | *Assistant District Attorney* |
| Dallas County, Texas | State Bar No. 24037304 |
| | Frank Crowley Courts Building |
| | 133 N. Riverfront Boulevard, LB-19 |
| | Dallas, Texas 75207-4399 |
| | (214) 653-3625 |
| | (214) 653-3643 *fax* |

## CERTIFICATE OF WORD-COUNT COMPLIANCE

I hereby certify that the foregoing brief, including all contents except for the sections of the brief permitted to be excluded by Rule 9.4(i)(1) of the Texas Rules of Appellate Procedure, is 9,853 words in length according to Microsoft Word 2010, which was used to prepare the brief, and complies with the word-count limit in the Texas Rules of Appellate Procedure. *See* Tex. R. App. P. 9.4(i).

/s/ Marisa Elmore
Marisa Elmore

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing brief was served on Bruce Anton, counsel for Appellant, by electronic communication through eFileTexas.gov to ba@sualaw.com, on July 1, 2015.

/s/ Marisa Elmore
Marisa Elmore