Roman Jesse **MENDOZA**, Appellant,

v.

The **STATE** of Texas, Appellee.

No. 05–09–01290–CR.

Court of Appeals of Texas, Dallas.

Sept. 15, 2011.

Taryn Davis, Law Office of Taryn Davis, Kaufman, Dan E. Wood, Jr., Attorney at Law, Terrell, for Appellant.

Rick Harrison, District Attorney Kaufman County, Sue Korioth, Assistant Criminal District Attorney, Kaufman, for State.

Before Justices O'NEILL, FITZGERALD, and LANG.

## OPINION

Opinion By Justice FITZGERALD.

Appellant Roman Jesse Mendoza was indicted for murder and relied on the defense of self-defense. The jury convicted him, and he appeals. We hold that the trial judge erred by instructing the jury on the doctrine of "provoking the difficulty," and accordingly we reverse appellant's conviction and remand the case for further proceedings.

## I. BACKGROUND

### A. Summary

On a Saturday night in October 2007, appellant, his brother Vincent Mendoza, and Juan Arturo Muro were socializing with Jorge Hernandez at Hernandez's house in Kaufman, Texas. All four men were drinking beer, and appellant, Hernandez, and Muro were using cocaine. At some point, appellant stabbed Muro with a knife, causing Muro's death. At trial, appellant testified and acknowledged that he killed Muro, but he insisted that he acted in self-defense. The jury convicted appellant of murder, sentenced him to 45 years in prison, and assessed a $10,000 fine.

### B. The State's case

Hernandez's next-door neighbor, Victoria Monsivais, testified that on the night of

October 13, she heard loud music coming from Hernandez's house between 10 and 11 p.m. At some point, the music stopped, and Monsivais heard noises that sounded like men fighting. She testified that it sounded like someone hitting someone, that it was a "terrible noise," and that it sounded like someone might be hurt. She looked outside through a window and saw nothing except the taillights of a car driving away. She called 911, and within a few minutes the police arrived. She spoke to the police officers, but she spoke very little English, and the police left within a few minutes. At about 10:30 a.m. on Sunday, October 14, Monsivais went outside to take out her trash. She saw a body lying in Hernandez's yard, and she went back inside and called the police.

Police officer Daniel Carrier responded to a call about a body at Hernandez's house on October 14. With the aid of photographs, he described the scene to the jury. The front yard of Hernandez's house was fenced off by a black, iron fence. A chain-link fence separated the front yard from the back yard on the left side of the house. Many beer cans were in the front yard. The officer saw Muro's body lying on the ground in Hernandez's back yard, roughly three to five feet from the chain-link fence. The police knocked on Hernandez's door until he came out, appearing as though he had just awakened. When the police showed him Muro's body, Hernandez appeared to be genuinely surprised and distraught. Hernandez identified appellant and appellant's brother Vincent, who lived across the street from Hernandez, as suspects.

Police officer Tim Moore, the crime-scene investigator, testified Muro's body was in a fetal position. There was no sign of a "big fight or a brawl or anything like that" at the scene, only the blood around Muro's body and signs of "[a] little bit of disturbance around it." Muro's body was in rigor mortis, indicating that he had been dead for a number of hours. Stab wounds were obvious on the body. There were no blood trails leading away from the body, which indicated to Moore that the injuries had occurred in that general area. Examination revealed that "there were quite a few stab wounds" on the body, including some to the head. Some time later, Moore participated in the execution of a search warrant at another location, the home of appellant's friend Romy Bradley. That search included a search of a septic tank on that property, and the investigators recovered a knife from the septic tank.

Tracy Dyer, a medical examiner for the Dallas County Medical Examiner's office, performed the autopsy on Muro's body. According to the autopsy report, Muro was about five feet, eight inches tall, and weighed 160 pounds. There were nine stab wounds on Muro's body. There was also a blunt-force injury on the top of Muro's head. A toxicology exam detected a blood-alcohol level of .23 percent and also detected cocaine and chemicals that result from the breakdown of cocaine in the body. There were no defensive wounds on the body, that is, no wounds on the hands or arms that would be consistent with attempting to fend off a knife attack. In Dyer's opinion, Muro did not sustain any wounds that would have killed him instantly, but he thought it would be a "long stretch" for Muro to have survived for as much as two hours with his injuries.

Jorge Hernandez, through an interpreter, testified that on October 13, his wife and child were out of town, so he invited his friend Muro to his house. While they were drinking beer and playing music, appellant and Vincent Mendoza joined them. All four men drank beer on the front porch and conversed for a while. Over the course of the evening, Hernandez had

about eight or nine beers. Muro had brought a bag of powder cocaine, and Hernandez, Muro, and appellant all snorted some cocaine. Hernandez made them use the cocaine inside his house so that their drug use could not be seen by others. Eventually, Muro said he did not have any more cocaine. When appellant said he wanted more, Muro said he would need money to buy more cocaine. Appellant said he did not have any money. After this conversation, all four men were in the living room. Muro and appellant went into the kitchen. When Muro came out, he told Hernandez to be careful because appellant had just pulled a knife on him. Muro also told Hernandez that appellant wanted more drugs. Hernandez asked Vincent what was wrong with his brother. Appellant and Vincent both seemed upset and seemed to want to fight with Muro. Hernandez was scared that they were going to fight in his house, so he ushered all three men outside. He saw appellant and Vincent walk to the middle of the street and stop; he also saw Muro sit down on the steps by the door. Hernandez sat down in his living room. Hernandez heard two shouts or screams, and he looked out his front door. He saw the Mendozas' car take off "real fast," and he did not see Muro. Hernandez testified that he called the police, but the police never knocked on his door. He was scared of getting into trouble, so he turned out his lights and went to sleep. He awakened when the police knocked on his door the next morning.

Hernandez acknowledged that the Mendozas never threatened him and he did not hear appellant threaten Muro. He never saw the knife that appellant stabbed Muro with but did see appellant with a small white knife used while they were using cocaine, "either crushing it or doing the line." Hernandez testified he stayed in the house after he had gotten the other three men to go outside. When he heard the screaming, he thought Muro had run away.

Romy Bradley testified appellant showed up at her house after 10:00 p.m. on October 13. He appeared to be scared and thought he had killed somebody. Appellant told her that he had been at a party at Phillip Circle and that a guy had followed him home. A fight broke out there and he stabbed the guy. He also told her that he was going to go down a back road and get rid of his clothes and his knife. She suggested that he could burn his clothes in a burn barrel out back and drop his knife in the septic tank. She did not see any blood on his clothes or on the knife. Appellant burned his clothes. Bradley dropped the knife in the septic tank, and she gave appellant some clothes to wear. Then he left. She talked to her family about the situation, and eventually her sister called the police, which led to the search warrant and the recovery of the knife.

## C. Evidence of self-defense

Vincent Mendoza testified he and appellant began socializing with Hernandez and Muro after Hernandez invited them to his house. Hernandez, appellant, and Muro did cocaine inside, but Vincent did not; they stayed outside while they were drinking beer. At some point, both Muro and appellant went inside the house. Appellant came back outside and said to Vincent, "Let's go." At this point, Muro, looking very angry, came out of the house with a big knife. Vincent was sure Muro wanted to use the knife on appellant. Hernandez ran away, and in doing so, he knocked Vincent's glasses off. Muro and appellant got into a "scuffle." Vincent saw appellant try to get away from Muro, but Muro kept coming at him. Appellant and Muro worked their way around to the far side of

the house towards the fence. Appellant emerged from the darkness and said, "Let's go." They got into the car and drove away. On cross-examination, Vincent testified that he is six feet tall and weighs about 330 pounds, and that appellant is about five feet, ten inches tall, and weighs "maybe 2 something, 250, maybe less, lot less."

Appellant testified that when he went into the house with Muro before the fight broke out, Muro had a knife in his hand and was acting strangely. Muro had his head down, was shaking it, and mumbled something. Appellant talked him into putting the knife down at one point. After appellant went back outside, Muro followed, knife in hand. Appellant was concerned that Muro might hurt Vincent, so appellant got between the two men. He testified that the fight itself was a blur and that he was convinced that Muro was trying to kill him. He testified that he stabbed Muro on purpose, to try to stop him, but he insisted he was not trying to kill him. At the end of the fight, appellant pushed Muro over the fence. On cross-examination, appellant testified that he sustained injuries to his hip and his rib cage during the fight. He described his injuries as "a bruise and a cut ... a cut from a bruise, like a hard hit that split the skin."

Appellant called Dr. Louis Deere as an expert witness. Deere testified that he has been a licensed psychiatrist since 1968 and that he is currently staff director of a unit at Terrell State Hospital. He has been trained as a substance-abuse specialist, and he has had over thirty years of experience with substance abusers. He described a condition called cocaine delirium, in which a person often experiences a false perception of reality, agitation, violent behavior, aggression, paranoia, and "unbelievable strength." Deere opined, based on Muro's autopsy results, that Muro was both drunk and high on cocaine at the time of his death. Deere also testified that he has treated people who exhibited levels of cocaine ingestion similar to Muro's, and that such people are usually aggressive, combative, and paranoid. He testified that on one occasion, a person exhibiting a similar level of cocaine ingestion exhibited unbelievable strength and had to be restrained by eight people (two firemen, four police officers, and two hospital staff members) while a ninth person injected him with something to calm him down. Appellant testified that Muro's behavior, starting with the time appellant went back into the house, was consistent with the behavior of someone experiencing cocaine delirium as described by Deere during his testimony.

## II. STANDARD OF REVIEW

Appellant's first issue is dispositive. Appellant argues that the trial court abused its discretion by instructing the jury on the doctrine of provocation over his objection.[1]

When an appellant alleges jury-charge error on appeal, we first determine whether the jury charge is erroneous. *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim.App.2005). If the charge is erroneous, we analyze the error for harm. *Id.* "The degree of harm necessary for reversal depends on whether the appellant preserved the error by objection." *Id.* (footnote omitted). If the appellant properly objected to the error in the trial court, the test for harm is whether the error was

1. We note that, during the charge conference, counsel for the State acknowledged that the State "actually drafted" the jury charge.

calculated to injure the appellant's rights, or, in other words, whether the appellant suffered "some harm" from the error. *Jimenez v. State,* 32 S.W.3d 233, 237 (Tex. Crim.App.2000); *see also Ngo,* 175 S.W.3d at 743.

### III. PROVOCATION

Appellant contends that the trial court erred by submitting the following instructions to the jury:

> You are further instructed as part of the law of this case, and as a qualification of the law on self defense, that the use of force by a defendant against another is not justified if the defendant provoked the other's use or attempted use of unlawful force, unless the defendant abandons the encounter, or clearly communicates to the other person his intent to do so reasonably believing he cannot safely abandon the encounter and the other person, nevertheless, continues or attempts to use unlawful force against the defendant.

> So, in this case, if you find and believe from the evidence beyond a reasonable doubt that the defendant, Roman Jesse Mendoza, immediately before the difficulty, if any, then and there did some act, or used some language, or did both, as the case may be, with the intent on his, the defendant's, part to produce the occasion for killing the deceased, Juan Muro, and to bring on the difficulty with said deceased, and that such words and conduct on defendant's part, if there was such, were reasonably calculated to, and did, provoke a difficulty, and that on such occasion the deceased attacked defendant with deadly force, or reasonably appeared to defendant to so attack him or to be attempting to so attack him, and that the defendant then killed the said Juan Muro by the use of deadly force, to wit, by stabbing him with a knife, in pursuance of his original design, if you find there was such, then you will find the defendant guilty of murder.

> On the other hand, if you find from the evidence that the acts done or language used by the defendant, if any, were not, under the circumstances, reasonably calculated or intended to provoke a difficulty or an attack by Juan Muro upon the defendant, or if you have a reasonable doubt thereof, then in such event, defendant's right of self-defense would in no way be abridged, impaired, or lessened, and, if you so find, or if you have a reasonable doubt thereof, you will decide the issue of self defense in accordance with the law on that subject given· in other portions of this charge, wholly disregarding and without reference to the law on the subject of provoking the difficulty.

### A. Summary of the law

Generally, "a person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force." TEX. PENAL CODE ANN. § 9.31(a) (West 2011). There are several limitations on the right to self-defense. *See id.* § 9.31(b). One limitation is the doctrine of provocation, also known as "provoking the difficulty." *See Smith v. State,* 965 S.W.2d 509, 512 (Tex.Crim.App.1998). Under the penal code,

> [t]he use of force against another is not justified ... (4) if the actor provoked the other's use or attempted use of unlawful force, unless: (A) the actor abandons the encounter, or clearly communicates to the other his intent to do so reasonably believing he cannot safely abandon the encounter; and (B) the other never-

theless continues or attempts to use unlawful force against the actor.

TEX. PENAL CODE ANN. § 9.31(b)(4).

The court of criminal appeals noted that the legal term of art, "provoking the difficulty," can be more accurately translated in modern usage to "provoked the attack." *Smith*, 965 S.W.2d at 512. It embodies a concept in criminal law that can act as a total bar against a defendant's right to self-defense. *Id.*

■ The court has held that the doctrine of provocation requires an element of intent that is not explicit in the penal code. *See id.* at 514. The *Smith* court stated the elements of provocation as follows:

> A charge on provocation is required when there is sufficient evidence (1) that the defendant did some act or used some words which provoked the attack on him, (2) that such act or words were reasonably calculated to provoke the attack, and (3) that the act was done or the words were used for the purpose and with the intent that the defendant would have a pretext for inflicting harm upon the other.

*Id.* at 513. A provocation instruction should be submitted to the jury only "when there is evidence from which a rational jury could find every element of provocation beyond a reasonable doubt." *Id.* at 514. Our inquiry is whether "a rational jury could have found provocation beyond a reasonable doubt, viewing the evidence in the light most favorable to giving the instruction." *Id.*

**B.  No evidence to support the provocation charge**

The first element of provocation is that the defendant did some act or used some words which provoked the attack on him. In this case, the relevant inquiry is whether appellant committed an act or used words that actually *caused the victim to attack appellant. See id.* We, therefore, focus on whether there is any evidence the victim attacked appellant in response to appellant's acts or words.

Initially, we are faced with two conflicting and irreconcilable accounts presented by the State and the defense. The State's account shows that Muro told Hernandez that appellant pulled a knife on Muro in Hernandez's kitchen. Thereafter, Hernandez believed appellant and his brother Vincent appeared angry in his living room. In order to alleviate any potential problem, Hernandez directed all three men out of his house. At this juncture, no fight had occurred. Appellant and Vincent actually walked away from the house to the middle of the street before stopping. Hernandez saw Muro sit down on the steps by the door. Hernandez did not testify to any other facts about how any fight actually started.

The defense account differed remarkably. Muro pulled a knife on appellant in the kitchen and momentarily put it down. Appellant and Vincent walked outside. Muro followed, wielding a butcher knife,[2] and attacked them without any provocation and for no apparent reason.

Under both accounts, it is undisputed Muro was far in excess of being legally intoxicated. The evidence showed he had drunk beer and used cocaine. Medical evidence showed he registered a blood alcohol content of .23 percent and cocaine was in his system. That evening, Hernandez had eight or nine beers and also used cocaine.

---

**2.** Vincent described Muro's knife as a "butcher knife." Appellant described it as "a standard kitchen knife."

The State makes the following argument in its appellate brief:

> The jury could reasonably infer from all the circumstances that appellant—who was angry about having no more free cocaine—attempted to instigate a fight with Arturo [decedent] in the kitchen, that he was prevented from pursuing his purpose momentarily when Hernandez ushered the group out of the house, and that he returned to Hernandez's back yard and located Arturo a few moments later with the intent of causing an altercation which would allow appellant to use his Army knife to inflict injury on Arturo. This evidence was sufficient to justify the provocation limiting instruction.

The State relies on evidence of two acts by appellant to satisfy the first element: appellant pulled a knife on Muro in Hernandez's kitchen; and appellant returned to the property after he and his brother had walked at least as far as the middle of the street.[3]

The record contains no evidence that either of these acts actually caused Muro to attack appellant. Hernandez did not testify that Muro attacked appellant in response to appellant's pulling out his knife or that Muro attacked appellant when appellant and Vincent appeared to be angry in Hernandez's living room. Further, Hernandez did not testify Muro attacked appellant at any time after appellant walked to the middle of the street. The State's argument that appellant left the property, came back, and killed Muro does not prove Muro attacked appellant. Hernandez did not witness the fight and offered no evidence showing Muro ever attacked appellant outside.[4]

The only evidence that Muro attacked appellant was the Mendozas' testimony that Muro attacked appellant and Vincent with a knife before they had left Hernandez's front yard. The State, however, does not argue that appellant's and Vincent's testimony constituted evidence that appellant's conduct actually provoked this attack by Muro, and for good reason. In context, this account shows Muro wielded the knife in Hernandez's kitchen and pursued appellant and Vincent outside with the intent to assault them with the knife. This version contradicts the State's theory of the case.

■ The State's argument fails to address the causation element of the equation, that is, any facts that would show appellant's conduct caused Muro to attack or attempt to attack appellant. In other words, the State has failed to show appellant's conduct provoked Muro into attacking appellant. While the State's theory

3. At oral argument before this Court, the State made the following argument:

> The State's position is that circumstantially, if self defense is—and, and self defense was given in an abundance of caution here because the defendant's testimony raised it, not because anybody was going to believe it. But if self defense was raised then so was provocation because according to the State's version, the defendant threatened him with the knife, Hernandez makes them leave, and at some point he had to come back because the murder happened in the back yard, so the murder couldn't have happened without him coming back. That the act of coming back is a provocation in

and of itself. The provoking was given, essentially, and I think the Court should view it as, if self defense applies, then so does provocation because there is a factual dispute here as to how, if he had left, how he got back in the yard and how this all happened in the back. And the jury was just entitled to consider it as a limitation if they believed that, yeah, he came back to continue the fight that he was entitled to self defense.

4. We note there was a clear, positive break in the sequence of events between the incident in the kitchen and the subsequent events outside Hernandez's house.

based on the evidence may be that appellant surprised or overwhelmed Muro and then killed him, a close reading of the record reveals no evidence Muro attacked or attempted to attack appellant with deadly force because of a provocative word or act by appellant. Submission of an instruction on provoking the difficulty requires evidence of this essential element.

The State cites several cases that it contends support the giving of the provocation instruction in this case. But the elements of provocation are fact questions, *Smith,* 965 S.W.2d at 513, and we conclude that the State's cases are all distinguishable based on comparisons of the specific evidence in question. In *Smith,* the defendant argued loudly with a third party which caused the victim to intervene and attack the defendant. *Id.* at 514–15. In *Yougas v. State,* a case decided by this Court, there was evidence that the defendant provoked the victim's attack by insulting and threatening the victim's brother at a restaurant and inviting the victim's brother to "[j]ust come outside." No. 05–07–00598–CR, 2008 WL 2791517, at *2 (Tex.App.-Dallas July 21, 2008, pet. ref'd) (not designated for publication). When the defendant swung at the victim, the victim tried to defend himself, and the defendant stabbed him. *Id.* In *Harrod v. State,* the defendant conceded he goaded the decedent into a fight. 203 S.W.3d 622, 629 (Tex.App.-Dallas 2006, no pet.). Ultimately, while the decedent stood on a porch holding a knife, the defendant charged and struck a fatal blow with a baseball bat. *Id.*[5] In *Staley v. State,* there was evidence that the defendant provoked the decedent's attack by holding his hands up in the air and making a kind of "macho guy move" to egg the decedent on

into fighting him. No. 04–09–00215–CR, 2010 WL 2680000, at *2, *5 (Tex.App.-San Antonio July 7, 2010, pet. ref'd) (mem. op., not designated for publication). The decedent then rushed the defendant, pushed the defendant's sister to the ground and wrestled with the defendant before defendant shot him five times. *Id.*

In the instant case, by contrast, the record contains no evidence Muro attacked or attempted to attack appellant because of any word or act by appellant. Accordingly, we conclude the trial court erred by submitting the provocation instruction to the jury.

## C. Harmful error

Because appellant objected, we reverse if the erroneous submission of the provocation jury instruction was "calculated to injure [his] rights." TEX.CODE CRIM. PROC. ANN. art. 36.19 (West 2006). This means no more than that there must be *some* actual harm to the accused from the error. *Almanza v. State,* 686 S.W.2d 157, 171 (Tex.Crim.App.1985) (op. on reh'g); *accord Splawn v. State,* 949 S.W.2d 867, 875 (Tex. App.-Dallas 1997, no pet.). Under this test, any harm, regardless of degree, is sufficient to require reversal. *Hutch v. State,* 922 S.W.2d 166, 171 (Tex.Crim.App. 1996); *Wells v. State,* 319 S.W.3d 82, 94 (Tex.App.-San Antonio 2010, pet. ref'd). To gauge harm, we consider "the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole." *Almanza,* 686 S.W.2d at 171; *accord Splawn,* 949 S.W.2d at 875. The harm question in this particular case is "whether, in the absence of the provoca-

---

5. In *Harrod,* the defendant did not object to the instruction on provoking the difficulty.

*Id.* at 628.

tion instruction, there would have been any chance that the jury would have found that [appellant] acted in self-defense." *Flores v. State,* No. 06–05–00023–CR, 2008 WL 41388, at *4 (Tex.App.-Texarkana Jan. 3, 2008, pet. ref'd) (mem. op., not designated for publication).

The State first argues that the provocation instruction was harmless because the trial judge could have given the jury different instructions, including one on the duty to retreat or one on provocation under section 9.31(b)(5). We reject this argument because the State advances it without any authority or analysis. *See State v. Blackshere,* 344 S.W.3d 400, 405 n. 6 (Tex.Crim.App.2011) (refusing to consider State's assertion unsupported by argument because it was inadequately briefed); *Meyer v. State,* 310 S.W.3d 24, 26 (Tex. App.-Texarkana 2010, no pet.) (court of appeals cannot create arguments for either party). Further, we gauge the harmfulness of charge error against the entire jury charge, *Almanza,* 686 S.W.2d at 171, not against a hypothetical jury charge that was not actually given. The State's argument is without merit.

The State also argues that the error was harmless "in light of the physical evidence, including the autopsy evidence regarding [the decedent]'s wounds . . . as well as the complete absence of . . . wounds on appellant." Although there was evidence that was inconsistent with appellant's theory of self-defense, we conclude that the evidence of guilt was not so overwhelming that the erroneous provocation instruction necessarily caused appellant no harm. Appellant and his brother testified consistently to facts that, if believed, supported appellant's defense of self-defense. Further, appellant testified that he sustained certain injuries to both his hip and his rib cage during the fight. But the jury was instructed to disregard appellant's defense, even if it believed he acted in self-defense, if appellant provoked Muro to attack him. The provocation instruction's presence in the jury charge implied that there was some evidence to support every element of the provocation doctrine when there was not. *See McCandless v. State,* 42 Tex. Crim. 58, 57 S.W. 672, 675 (1900) (holding that giving of provocation charge without sufficient evidence was harmful error because it was "calculated to make the jury believe that, in the opinion of the judge, there was evidence tending to show that appellant brought on the difficulty for the purpose of slaying his adversary"); *see also Tave v. State,* 620 S.W.2d 604, 605–06 (Tex.Crim.App. [Panel Op.] 1981) (holding that erroneous submission of provocation instruction was harmful).

Other factors support our conclusion that the error was harmful. During jury selection, the State questioned the panel about the law of provoking the difficulty and how it would entirely eliminate any right to self-defense.[6] The evidence in this case shows a beer-and-cocaine-laced party

---

6. The State engaged in the following dialogue during voir dire:

THE STATE: Another limitation on self-defense is what we call provoking the difficulty. A person who actually does the killing can not provoke the difficulty. Let's flip roles this time. Say it's somebody I don't like, and I go up to them and start cussing them and calling them bad names, okay. And finally I start in on their mother, and they reach back to take a swing at me or maybe they pull out a pocket knife. I say

great, I'm glad you finally did that. Boom, boom, boom, shoot them ten times. Is that self-defense?

VENIREPERSON: No.

THE STATE: Why?

VENIREPERSON: You provoked him

THE STATE: I provoked him. I was looking for an excuse to kill that person, and I provoked that difficulty. Sometimes these issues come up. I don't know if it'll come up in this case. . . .

culminating in a death caused either by an intentional murder or in self-defense. The facts were hotly contested by both sides. The provocation jury instructions occupied three substantial paragraphs of the court's charge to the jury and made up a significant part of the entire jury charge in this case. Moreover, the provocation instructions immediately followed the self-defense instructions, which makes it more likely that the jury's attention was drawn to the State's provocation theory for avoiding appellant's claim of self-defense. The state of the evidence also supports the proposition that appellant was harmed by the inclusion of the provocation charge. Appellant testified that he stabbed Muro, so his entire defense rested on the theory of self-defense. Thus, any erroneous instruction that limited his self-defense theory was likely to be harmful. *Cf. Tave*, 620 S.W.2d at 605 ("If not called for by the facts, a charge on provoking the difficulty constitutes an unwarranted limitation on the right of self-defense.").

Both sides focused their arguments on the plausibility of appellant's self-defense theory. Thus, even though the State did not emphasize the provocation instruction in closing arguments, the centrality of appellant's self-defense theory during closing arguments necessarily increased the importance of any part of the jury charge that curtailed the right of self-defense, including the provocation instruction. And, as previously noted, the State discussed the law of provoking the difficulty during jury selection and clearly indicated self-defense would not apply in such a situation. Thus, the proverbial "well" was already poisoned.

At trial and on appeal, the State asserts that the instruction was raised by evidence that appellant pulled a knife on Muro in the kitchen of Hernandez's house and appellant returned to Hernandez's yard where the incident occurred. The State aggressively maintains this position as a reasonable interpretation of the law as it applies to the facts of this case. We recognize the common understanding of the term "provoke" indicates conduct designed to stir up or incite anger in another. The State's evidence showed appellant engaged in conduct designed to provoke Muro, in accord with this common understanding. But as used in the court's jury instructions, we must recognize that the term "provoke" is a legal term of art. When the term is used within the context of court instructions setting forth the law on "provoking the difficulty," the law requires proof the defendant's conduct actually evoked a response from another. But the State's appellate oral argument emphasized only the common understanding of the term, and not the necessity of an actual causal nexus between appellant's conduct and Muro's attack. It is understandable that the common understanding of the term "provoke," relied on even in this Court by seasoned and experienced prosecutors, would also appear evident and logical to the jury in this case. This erroneous interpretation of pivotal language in the court's instructions, however, would necessarily preclude a jury from considering the statutory right of self-defense.[7]

■ There is another and equally troubling consideration, the precedent set if we were to conclude the error was harm-

---

7. An appellant's ability to show harmful error under such circumstances is hampered by the rule that jurors may not testify "as to any matter or statement occurring during the jury's deliberations, or to the effect of anything on any juror's mind or emotions or mental processes, as influencing any juror's assent to or dissent from the verdict." Tex.R. Evid. 606(b); *see also Lucero v. State,* 246 S.W.3d 86, 94 n. 7 (Tex.Crim.App.2008) (noting the "general rule of not permitting a juror to impeach his own verdict").

less. The provocation instructions did not simply define, modify, explain, or minimize the effect of evidence admitted or further explicate other instructions of the court. Instead, these instructions had a dual adverse effect: they significantly enhanced the State's position by rendering the State's evidence immediately more formidable, and they undermined appellant's entire defense. These significant consequences were visited upon appellant notwithstanding the complete lack of evidence to support the instructions. If the trial court had refused to give any self-defense instruction at all, this would undoubtedly have been harmful error. *See, e.g., Carmen v. State*, 276 S.W.3d 538, 546–47 (Tex. App.-Houston [1st Dist.] 2008, pet. ref'd) (refusing to give self-defense instruction that was supported by the evidence was harmful error where appellant's entire defense was self-defense). Here, the trial court did submit the law on self-defense. However, immediately thereafter, the trial court instructed the jury to completely disregard it if the jury found "provocation." By giving the provocation instruction, the trial court in this case essentially deprived appellant of his entire defense. Thus, our decision is also prompted by our deep concern that we should not set a bad precedent for future cases. We will not minimize the significance of the error prompted by the State and acquiesced in by the trial court by dismissing it as harmless.

## D. Conclusion

We conclude that the first element of provocation was not supported by the evidence. Submission of substantial and detailed instructions on provoking the difficulty severely handicapped appellant's right to have the jury consider and evaluate the merits of his defense of self-defense unencumbered by the provocation limitation. Under the particular facts and circumstances of this case, we conclude the record shows that appellant suffered some harm from the erroneous instructions. We need not consider appellant's second issue on appeal because it would not entitle him to any greater relief than our resolution of the first issue.

### IV. DISPOSITION

We reverse the trial court's judgment and remand for further proceedings consistent with this opinion.