# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

NO. 03-23-00456-CR
NO. 03-23-00457-CR

---

**Israel Ballester, II, Appellant**

**v.**

**The State of Texas, Appellee**

---

**FROM THE 20TH DISTRICT COURT OF MILAM COUNTY**
**NO. CR27,619 & CR27,620, THE HONORABLE JOHN YOUNGBLOOD, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

A jury convicted appellant Israel Ballester, II of two counts of aggravated assault with a deadly weapon against James Bradan Eudy and Brandon Fenton Carl, and the district court sentenced Ballester to fifteen years' imprisonment.[1] *See* Tex. Penal Code § 22.02. During trial, Ballester raised the issue of self-defense. The trial court included self-defense in the jury charge, an instruction on multiple assailants, and an incomplete instruction on provocation. On appeal, Ballester contends that (1) the trial court erred by refusing his proffered instruction on the legal definition of provocation; (2) the evidence is insufficient to support the implicit rejection of his assertion of self-defense; and (3) the prosecution engaged in improper closing argument by complaining that Ballester got to sit in the courtroom during the trial, hear all the evidence

---

[1] The jury acquitted Ballester of a separate count, charging him with the murder of Dalton Lee Shaw.

presented against him, and make up a story that he had rehearsed with his counsel. We will reverse the district court's judgments of conviction and remand these cases for a new trial.

## BACKGROUND[2]

Evidence at trial showed that the offenses stemmed from a dispute between adjacent landowners over a broken fence that allowed a bull to cross a property line. Ballester's property was accessible only by a shared easement on Eudy's property. Eudy owned livestock and was responsible for maintaining the fence and gate between the properties. The fence deteriorated, and Eudy's livestock crossed onto Ballester's property. Eudy and Ballester bought their respective properties about two years earlier. In the past, they had a dispute about allowing Eudy's livestock to graze on Ballester's land, and they did not have a "good neighborly relationship" before the offenses occurred.

### Notification of loose bull and need for fence repair

On the Friday of Mother's Day weekend, Ballester; his wife, Tangeline; and their two children took an RV to his property and planned to have guests over the next day. When the Ballester family arrived, Eudy's bull was on Ballester's property. Tangeline sent a text notifying Eudy of the family's weekend plans and the loose bull, who was "not happy." She said that Eudy needed to get the bull or she would have to call the sheriff, noting that Eudy already had months to make the fence repair. Eudy, who resided and worked in Buda, was over an hour away from the property. He replied that the sheriff's office should be contacted. Eudy also

---

[2] The State omits any statement of facts from its brief, thereby indicating its satisfaction with the statement of facts presented in Ballester's brief. *See* Tex. R. App. P. 38.2(a)(1)(B) (requiring statement of facts in appellee's brief if "appellee is dissatisfied with that portion of appellant's brief"). The statement of facts in Ballester's brief is supported by record references. *See id.* R. 38.1(g).

2

asked his brother, Shaw, and a friend, Carl, to help him fix the fence and get the bull. They agreed. The men left Buda sometime around 6:45 p.m. or 7:00 p.m. Ballester did not know Shaw or Carl.

Meanwhile, Ballester was able to temporarily contain the bull by moving his truck alongside the nearest fence opening to block it, but there were several other openings in the fence between the properties, and Eudy's livestock again crossed over.

**Sheriff's deputy responds to loose-livestock call**

A Milam County Sheriff's Office deputy testified that he arrived at the scene about 7:00 p.m. to address a call about loose-livestock trespassing. His body-cam video was admitted into evidence and showed him speaking at sundown with Tangeline, who reported that the problem with the fence had been ongoing for months. She stated that she disliked interacting with Eudy because of his nature, noting that he had a criminal past, had been to prison, and was aggressive.[3] The deputy said he would call Eudy.

Eudy, Carl, and Shaw arrived at the property about 8:30 p.m. with a bulldozer, a Bobcat skid steer with a hammer attachment, and a front-end loader tractor to plow over all the old fence and tore it all down. Cell-phone video taken by one of Ballester's children was admitted into evidence and showed Eudy yelling, "C'mon boys, let's fix this fence." Eudy drove the bulldozer toward Ballester's parked truck and repeatedly cursed at him to move it, screaming, "This is my easement, I got a 20-foot easement right here, get the fuck off my easement"; "Get your fucking truck off my goddamn easement"; "Get the fuck outta the way"; and "I said,

---

[3] The jury heard undisputed evidence that Eudy was released from prison in 2011 after his felony conviction and was arrested twice while on parole. The jury also heard undisputed evidence that Carl was on probation for bodily-injury assault.

3

move." Ballester moved the truck that he had parked alongside the fence opening, and Tangeline called the sheriff.

**Sheriff's deputy speaks with all parties involved**

The same deputy who had been at the property earlier that day returned about 9:45 p.m. and spoke with Eudy, Carl, and Shaw. On the deputy's body-cam video, Eudy told the deputy that he was fixing the fence at the Ballesters' request and that he was "sick of them." Eudy said other neighboring landowners did not make sheriff's reports about Eudy's loose livestock. Eudy also said that he, Shaw, and Carl had been at the property just three or four weeks earlier to fix part of the fence and install another gate after the Ballesters complained that Eudy's calves were crossing into their property. When the deputy asked if Eudy had been in a verbal argument, he initially told the deputy that he had "not said a word to [Ballester]." Eudy then admitted saying, "You let me on my fucking easement," and "they backed outta there." The deputy noted that this was not the first time the sheriff's office received a call about Eudy's loose livestock, but Eudy would not get a citation if he made an effort to fix the fence.

The deputy then spoke separately with the Ballesters. The body-cam video shows that the deputy advised Ballester to take pictures of any livestock that crossed and any fence disrepair and send the pictures to Eudy. If Eudy did not respond, then the Ballesters could notify the sheriff. The deputy also explained that if the bull acted in a threatening manner toward the family on their property, and if Ballester owned any firearms, he could "do what he had to do." Ballester told the deputy about prior problems with Eudy that were reported to the sheriff's office, including when Eudy left a bulldozer idling all night near the Ballesters' campsite when there was no work in progress, and when Eudy idled his truck with its high beams activated and

4

facing the Ballesters' campsite all night. Ballester also told the deputy that Eudy said he was going to make sure that the Ballesters would not enjoy the land and could never sell it. The deputy explained that such conduct was not illegal.

Next, the deputy went back to Eudy, Carl, and Shaw. He cautioned Eudy that his "heated argument" with the Ballesters had to stop because it could lead to a fight and going to jail. Eudy asked, "How much is that bond? Just kidding." Before he left, the deputy asked the men to be civil and to try not talking to the Ballesters unless necessary.

Eudy recalled that he, Carl, and Shaw were in no hurry while fixing the fence. Ballester testified that the men appeared to be drinking.[4] Eudy, Carl, and Shaw stopped working on the fence shortly after midnight.

**Verbal argument ensues and escalates**

Accounts of the events that followed differed. Ballester's recollection was that, as the other three men were leaving for the night, he went to look at the fence work and check the remaining openings. According to Ballester, Eudy yelled that the fence was partially fixed, but that they would return the next day to fix the rest of it and get the bull. Tangeline responded that the deputy advised them if the bull attacked, they could defend themselves. Ballester testified that Eudy became angry and asked, "You are going to kill my cattle now?" Ballester clarified that unless his family had to defend itself, there would be no shooting of cattle. Ballester testified that Tangeline took out her phone when Eudy said, "Oh, you are going to kill me, you are going to shoot me?" and "You hear that boys? He threaten[ed] to shoot me."

---

[4] Body-cam video shows that another law-enforcement officer, who later arrived at the scene to investigate, saw an open case of Dos Equis beer on the tailgate of a blue truck on Eudy's side of the fence and said, "Boy, they were drinking." A photo admitted into evidence of a trash can near the Ballester's trailer contained two beer bottles and a can of hard seltzer.

By contrast, Eudy testified that he was planning to leave but left his truck in neutral and running while he walked to help Shaw get his pickup truck. Eudy said that he walked with Shaw to his pickup "[b]ecause the murderer likes to talk crap to my brother." According to Eudy, Ballester came to the fence line for an unknown reason and yelled, "Next time I will fucking kill you."

A verbal argument ensued, initially between Eudy, Ballester, and Tangeline, then Shaw, too. Carl was about 100 yards away, unhooking a gooseneck hitch from his truck with the engine running, when he heard the commotion and raised voices but was unable to make out what was being said or who was saying it. Carl started walking back toward the gate. Tangeline recorded the argument with her phone, and that video was admitted into evidence.

The video shows that Shaw went around a fence, advancing toward Ballester and Tangeline. Ballester started saying, "The sheriff said—" when he was interrupted by Shaw yelling, "Hey, don't get fucking loud with him, get loud with me, son." Shaw kept getting nearer until his face was directly in front of the camera, and he said, "Who you gonna fucking shoot?" Ballester responded, "Whoa, whoa, whoa," and the camera was jostled and became unstable. Shaw said, "You're gonna fucking pull a gun?" The camera showed a close-up view of Shaw's face, and then the camera fell lens up, showing grass and darkness before Tangeline retrieved the phone from the ground.

Ballester testified that this part of the video showed that while they were on their own property, Shaw pushed through Tangeline and pushed Ballester immediately afterward. Eudy disputed that anyone touched Tangeline. Ballester recalled that in the moment, he felt he had to act in defense of himself, Tangeline, and potentially his children, who were still on the

6

property. He reached into his pocket for his pistol, which is when Shaw made his comments about pulling a gun. After that, Shaw slapped the phone out of Tangeline's hand.

Video shows the argument continued. Ballester repeatedly told Shaw, "Don't touch me." From the other side of the fence, Eudy said, "Let me get this on camera," and his phone started emitting a bright light.[5] He screamed, "Pull the trigger, bitch. You wanna pull a gun? You ain't gonna use it." Ballester replied, "I will defend myself." Shaw yelled at Ballester, "You're a fucking faggot-ass little bitch"; "You're a fucking Marine? What the fuck?"; "You're a fucking disgrace"; and "Act like a fucking Marine," because Ballester was not fighting with him physically.

Tangeline called 911. She reported being pushed and said she needed "someone to get these three men off of here now." Eudy heard her report and told the jury that while this was going on, he could also hear that "the murderer's wife is on the phone with the police."[6]

Next on the video, Ballester yelled, "You attacked my wife on my easement." Shaw said, "So what?" Eudy said it was his easement and his property, and he screamed at Ballester, "You wanna pull a gun? Shoot it; use it, bitch. Use the fucking gun. Use it. Use it." Ballester responded, "Only if I have to. That's the difference—that's the difference." Eudy replied, "Then don't pull it like a little bitch." Ballester said, "Your words don't mean shit to me; go away," and began stepping backward. Eudy said, "Oh, they should."

---

[5] No photo or video from Eudy's phone depicting this event was admitted into evidence.

[6] The trial court overruled defense counsel's objection to Ballester being referred to as "the murderer."

**Moments before shooting**

When Carl walked over, he saw Ballester and Shaw fairly close to each other. Carl testified that Eudy was near to him, also fairly close. The video shows that Carl walked in the shadows from the left toward Eudy. Shaw walked in the shadows from the right, in front of Eudy and Ballester, toward Carl. Carl—who was in brown pants rather than jeans like Shaw— is visible from shadows behind Eudy during the argument with Ballester. Shaw later walked toward his blue truck from the left.

Ballester testified that he tried to look in all directions and keep track of where everyone was located. He said he had multiple people screaming at him from multiple directions, so he was watching and moving and trying to avoid being blindsided. He recalled feeling surrounded, like "being attacked by hyenas."

Carl saw Shaw walking to his truck, behind Eudy. Eudy glimpsed something out of the corner of his eye, looked left, and ran to Shaw screaming, "No, No, No, No, No, No." Eudy was pretty sure that inside the truck, Shaw had an AR rifle. Eudy said that he himself did not have a gun that night. Shaw went to the back seat of his truck. When Carl saw that, he knew that Shaw was not getting in his truck to leave. Like Eudy, Carl expected that Shaw had a weapon with him, and Carl thought Eudy was screaming because he believed Shaw was getting that weapon.

On the video, there is a sound just before Eudy starts repeatedly screaming, "No," and the same sound again during his screams. Ballester identified the sound as a vehicle's door closing. He heard the distinct "ch-ch" of a round being chambered into a firearm, he came around the corner and saw that "they [we]re all grouped together," and then he saw Shaw raising an AR-15 rifle towards him. Eudy disputed that any gun came out of the truck or that

8

Shaw had a gun in his hand that night. Ballester testified that in a flash, he thought of having to bury his wife, daughter, and son. He said, "[O]nce I saw the rifle, I just had to decide whether I live, whether my family lives[.]"

In a matter of seconds, Ballester fired multiple rounds from his pistol. Shaw was fatally shot, Eudy had a gunshot wound to his lung, and Carl had less-serious gunshot injuries to his hand. The scene afterward was chaotic. Carl tried to use his truck to seek help but was unsuccessful. Ballester assisted law enforcement in performing CPR on Shaw, cooperated with them, and described what happened. Vehicles, equipment, and people were moved from their initial locations, and Shaw was taken to a funeral home where embalming began before eventual relocation to the medical examiner's office for an autopsy.[7] Law-enforcement officers found on the ground near Shaw an AR-15 semi-automatic rifle, which was loaded and ready to fire with a round in the chamber and 30 more rounds in a magazine. Another 30-round rifle magazine was found on the truck's passenger-side floorboard.

Ballester was charged and convicted on two counts of aggravated assault with a deadly weapon. After his motion for new trial was denied, he filed this appeal.

---

[7] A justice of the peace told a deputy at the scene, "I'm sure as hell ain't gonna order no autopsy." The medical examiner who later performed the autopsy testified that Shaw had a blood-alcohol level of .11. A toxicology report with those results was admitted into evidence.

**DISCUSSION**

## I. Sufficiency of evidence supporting rejection of self-defense claim

Ballester never contested shooting Shaw, Eudy, and Carl; rather, he admitted it and relied on his assertion of self-defense. He contends that the evidence is legally insufficient to support the implicit rejection of his self-defense claim.[8]

### A. Standard of review

We address a challenge to the sufficiency of the evidence by considering whether, after viewing all of the evidence in the light most favorable to the verdict, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Zuniga v. State*, 551 S.W.3d 729, 732 (Tex. Crim. App. 2018) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017)). Under this standard, we defer to the trier of fact's responsibility to fairly resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from basic facts to ultimate facts. *Id.* "We may not re-weigh the evidence or substitute our judgment for that of the factfinder." *Id.* Factfinders are permitted to draw any reasonable inferences from the facts so long as each inference is supported by the evidence presented during the trial. *Id.* We presume that the factfinder resolved any conflicting inferences from the evidence in favor of the verdict, and we defer to the resolution of the factfinder as the exclusive judge of the facts, witnesses' credibility, and the weight to be given to the testimony. *Id.* Direct evidence and circumstantial evidence are equally probative,

---

[8] We address Ballester's last issue first because if sustained, it would afford him the greatest possible relief, an acquittal. *See Davis v. State*, 413 S.W.3d 816, 820 (Tex. App.—Austin 2013, pet. ref'd).

and circumstantial evidence alone may suffice to uphold a conviction so long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction. *Id.*

A person commits an assault if he "intentionally, knowingly, or recklessly causes bodily injury to another." Tex. Penal Code § 22.01(a)(1). A person commits the offense of aggravated assault if he "commits assault as defined in [section] 22.01 and [he] . . . uses or exhibits a deadly weapon during the commission of the assault." *Id.* § 22.02(a)(2). Self-defense is defined in the Penal Code: "[A] person is justified in using force against another when and to the degree [he] reasonably believes the force is immediately necessary to protect [himself] against the other's use or attempted use of unlawful force." *Id.* § 9.31(a). Self-defense is a fact issue for determination by a jury. *Saxton v. State*, 804 S.W.2d 910, 913 (Tex. Crim. App. 1991).

## B. Self-defense burdens of production

The defendant bears the initial burden of producing some evidence to support a claim of self-defense. *Braughton v. State*, 569 S.W.3d 592, 608 (Tex. Crim. App. 2018). Once the defendant produces some evidence raising self-defense, the State bears the burden of persuasion to show beyond a reasonable doubt that the defendant's actions were not justified. *See id.* at 606, 608. In evaluating the sufficiency of the evidence supporting a jury's rejection of a claim of self-defense, we ask not whether the State presented evidence refuting the self-defense testimony but whether any rational juror could have found against the claim of self-defense beyond a reasonable doubt, after viewing all the evidence in the light most favorable to the prosecution. *Id.* at 608; *Saxton*, 804 S.W.2d at 914 ("A jury verdict of guilty is an implicit finding rejecting the defendant's self-defense theory."). Defensive evidence that is merely consistent with physical evidence at the scene of the alleged offense will not render the State's

11

evidence insufficient because the credibility determination of such evidence is solely within the jury's province, and the jury is free to accept or reject the defensive evidence. *Id.*

Ballester notes that the jury acquitted him as to one complainant and that the jury received an instruction on multiple assailants; thus, he says an acquittal as to one complainant required an acquittal as to all three. *See Dickey v. State*, 22 S.W.3d 490, 493 (Tex. Crim. App. 1999) ("The theory behind the multiple assailants charge is that, when it is clear that an attack is being conducted by multiple people as a group, a defendant is justified in using force against any member of the group, even if the recipient of that force is not engaging in conduct that would, by itself, justify the use of force (or deadly force as the case may be)."). But because the jury rendered a general verdict on a form that did not include a special finding that Ballester acted in self-defense, we cannot conclude with certainty that the acquittal rested on a self-defense finding. *See* Tex. Code Crim. Proc. art. 37.07, § 1(a) ("The verdict in every criminal action must be general."); *see also State v. Ramos*, 479 S.W.3d 500, 508-09 (Tex. App.—El Paso 2015, no pet.) (concluding that jury's acquittal of defendant on murder charge but conviction on charge of aggravated assault by threat was not proof that jury had based its acquittal on self-defense).

The evidence at trial showed that when the shooting occurred, it was dark, Ballester was unsure where each of the three men were located, and he fired multiple rounds toward them. The jury could have reasonably believed that under those circumstances, the shooting—even if not committed to intentionally or knowingly cause the results it did—was reckless because it was done with conscious disregard of a substantial and unjustifiable risk that those results would occur. *See* Tex. Penal Code § 6.03 (defining culpable mental states). And if the jury had that reasonable belief about Ballester's mental state, it would not have reached the question in the charge raising the issue of self-defense as to the shooting of Shaw and rendered

12

an acquittal verdict because recklessness was not included among the possible culpable mental states in the murder charge. Recklessness was included only in the charges on aggravated assault with a deadly weapon as to the shooting of Eudy and Carl. Thus, the jury could have reasonably found that the State failed to prove its case beyond a reasonable doubt as to the requisite element of an intentional or knowing mental state in the murder charge but that the State met its burden of proof by proving the mental state of recklessness as to the aggravated-assault charges. *See Braughton*, 569 S.W.3d at 608; *Saxton*, 804 S.W.2d at 914.

Further, if the jury disbelieved that Shaw pushed the Ballesters and believed that Ballester pulled his pistol and later fired it in response to verbal provocation alone, the jury could have rejected the self-defense claim. *See* Tex. Penal Code § 9.31(b)(1) (stating that use of force is not justified against another in response to verbal provocation alone). Because there was conflicting testimony on these matters, we must defer to the jury's credibility and weight determinations. *See Jackson*, 443 U.S. at 319, 326; *Braughton*, 569 S.W.3d at 608. Thus, we conclude that a rational jury could have rejected Ballester's assertion of self-defense as to Eudy and Carl, as presented in their two jury charges. We overrule this issue.

## II. Refusal of jury-charge instruction with legal definition of "provocation"

Ballester also contends that the trial court erred by refusing his proffered jury-charge instruction that would have provided the jury with the legal definition of provocation. *See* Tex. Code Crim. Proc. art. 36.15 (stating that defendant may, by special requested instruction, call trial court's attention to errors or omissions in charge, and that trial court's refusal of such special requested instruction preserves error). He says that inclusion of the definition would have allowed the jury to apply the technical or particular meaning of that

13

word, as defined by the Court of Criminal Appeals, when considering the instruction already provided in all three jury charges on provocation (also known as "provoking the difficulty").

The State's brief does not address Ballester's argument about the exclusion of his requested provocation definition. Instead, the State argues that "Eudy and Carl never attacked Appellant." *But see Dyson v. State*, 672 S.W.2d 460, 463 (Tex. Crim. App. 1984) (reviewing whether defendant forfeited his self-defense claim by provoking his brother and noting that defendant was not in fact attacked by his brother was "immaterial" because person has right to defend himself from apparent danger to same extent as if danger had been real, provided he acted on reasonable apprehension of danger as it appeared to him at time); *see also Courtney v. State*, 908 S.W.2d 48, 52 (Tex. App.—Houston [1st Dist.] 1995, pet. ref'd) (noting that because ordinary person might reasonably believe that he is being attacked by another when in fact he is not, proper use of self-defense is not limited to situations when person is "actually attacked").

## A. Standard of review

When there is a claim of jury-charge error, there are two standards of review based on whether the defendant objected to the charge. *Alkayyali v. State*, 713 S.W.3d 780, 789 (Tex. Crim. App. 2025). If a defendant objects to error in the jury charge, the reviewing court considers whether the error at issue resulted in some harm. *Id.* Some harm requires reversal "if the error is 'calculated to injure the rights of the defendant,'" meaning that the error cannot be harmless. *Id.* (quoting *Reeves v. State*, 420 S.W.3d 812, 816 (Tex. Crim. App. 2013)).

Here, Ballester preserved error by proffering an instruction defining provocation, which the trial court refused to include in the jury charge. *See* Tex. R. App. P. 33.1(a) (addressing preservation of appellate complaints). Ballester specifically cited to the trial court

14

the Court of Criminal Appeals' decision in *Smith v. State*, a case that defines "provocation" in a technical or particular manner applicable only to assertions of self-defense in criminal proceedings. *See* 965 S.W.2d 509, 513 (Tex. Crim. App. 1998). And Ballester provided a copy of the *Smith* decision to the trial court when making his request that the jury charge incorporate the Court of Criminal Appeals' definition of provocation.

## B. Provocation instruction generally

An instruction on "provoking the difficulty" is a limitation on a defendant's right to self-defense. *Elizondo v. State*, 487 S.W.3d 185, 197 (Tex. Crim. App. 2016). It informs the jury that the defendant forfeits his right of self-defense if he provoked the difficulty to have a pretext for injuring another. *Smith*, 965 S.W.2d at 512. Thus, a provocation instruction is required when there is sufficient evidence that (1) the defendant did some act or used some words that provoked the attack on him, (2) such act or words were reasonably calculated to provoke the attack, and (3) the act was done or the words were used for the purpose and with the intent that the defendant would have a pretext for inflicting harm upon the other. *Elizondo*, 487 S.W.3d at 197 (citing *Smith*, 965 S.W.2d at 513). In reviewing the propriety of a provocation instruction, we ask whether there was sufficient evidence from which a rational jury could have found provocation beyond a reasonable doubt, viewing the evidence in the light most favorable to giving the instruction. *Smith*, 965 S.W.2d at 514.

By including an instruction on provocation, the trial court implicitly determined that there was sufficient evidence supporting all three elements. Notably, the evidence at trial included testimony that Ballester said he would shoot Eudy's livestock the next time it was on his property; that the Ballesters and Eudy did not have a "good neighborly relationship"; that this

15

was a repeat trip to the property because Eudy, Shaw, and Carl had been there just a few weeks earlier to fix the fence at the Ballesters' request; that "the murderer like[d] to talk crap to [Shaw]"; and that Ballester came to the fence line for an unknown reason and yelled, "Next time I will fucking kill you." These events preceded and prompted the argument in which Ballester and Tangeline were pushed. After that physical contact, Ballester testified that the other men were "grouped together" when he heard a round being chambered into a rifle, which led to him firing his pistol toward them. Viewed in the light most favorable to giving the provocation instruction, this was some evidence from which a rational jury could have found provocation beyond a reasonable doubt. *See id.*

The jury charge limited Ballester's self-defense claim by instructing the jury that self-defense is not justified (1) in response to "verbal provocation alone" or (2) if "the defendant provoked the other's use of force." *See* Tex. Penal Code § 9.31(b)(1), (4). But the trial court did not include a corresponding legal definition for "provocation," which has a technical or particular legal meaning. *See Smith*, 965 S.W.2d at 513.

## C. Proposed instruction with legal definition of provocation under *Smith*

During the charge conference defense counsel submitted a proposed instruction defining provocation, expecting that prosecutors would argue during closing that Ballester was the provocateur and thus disqualified from claiming self-defense on all three charges. *See* Tex. Penal Code §§ 9.31(b)(4) (providing that use of force against another is not justified if actor provoked other's use or attempted use of force), .32(b)(2) (providing that actor's belief that deadly force was immediately necessary is presumed reasonable if actor did not provoke person against whom force was used). The requested instruction was drawn from *Smith*:

16

> To find that the actor provoked the other's use or attempted use of unlawful deadly force, the state must prove beyond a reasonable doubt that:
>
> (1) the actor did some acts or used some words that caused the other person to attack the actor, and
>
> (2) the acts or words by the actor were reasonably calculated to provoke the attack, and
>
> (3) the actor did the acts or used the words for the purpose and with the intent that the actor would have a pretext for killing the other person or inflicting serious bodily injury on him.

*See Smith*, 965 S.W.2d at 513. The proffered instruction is nearly identical to the model set forth in the Texas Criminal Pattern Jury Charges. *See* Comm. on Pattern Jury Charges, State Bar of Tex., Texas Criminal Pattern Jury Charges: Justification Defenses CPJC 9.19 (2025). The pattern-jury-charge committee concluded that, under *Smith*, as part of the self-defense instructions in prosecutions for murder or other offenses involving deadly force, "the defendant's provocation should be defined as requiring an intent to use the occasion as a pretext for either killing the complainant or causing the complainant serious bodily injury." *Id.* at 9.15. Nevertheless, the trial court informed defense counsel that "the objection is overruled," refusing to include the requested legal definition of provocation.

"Words and phrases that have acquired a technical or particular meaning, whether by legislative definition or otherwise, shall be construed accordingly." Tex. Gov't Code § 311.011(b). Words may acquire a technical meaning through their common-law history. *See Joe v. State*, 663 S.W.3d 728, 732 (Tex. Crim. App. 2022) (citing *Medford v. State*, 13 S.W.3d 769, 772 (Tex. Crim. App. 2000) (concluding that "arrest" had acquired technical meaning based on its established history in common law)). The Court of Criminal Appeals indicated over two decades ago that "provocation" should be defined in a technical or particular manner applicable

only to assertions of the self-defense justification in criminal proceedings. *See Smith*, 965 S.W.2d at 513; *accord* Comm. on Pattern Jury Charges, State Bar of Tex., Texas Criminal Pattern Jury Charges: Justification Defenses CPJC 9.15, .19. After implicitly determining that the evidence warranted a provocation instruction, the trial court erred by not providing the jury with the technical or particular legal definition of "provocation." Because Ballester preserved this charge-error complaint, we must consider whether the error caused some harm. *See Alkayyali*, 713 S.W.3d at 789; *Reeves*, 420 S.W.3d at 816.

### D. "Some harm" analysis

The "some harm" analysis requires a reviewing court to consider: (1) the jury charge as a whole, (2) the arguments of counsel, (3) the entirety of the evidence, and (4) other relevant factors present in the record. *See Reeves*, 420 S.W.3d at 816.

### 1. Jury charge as a whole

The jury charge addressed provocation within the self-defense instruction. That instruction—with a handwritten note to list the correct offense—in both charges looked like this

**Self-Defense**

A person's use of deadly force against another that constitutes the crime of murder is justified by self-defense when the person reasonably believed the degree of force used was immediately necessary to protect the person against the other's use of unlawful deadly force.

IMAGED

6

18

> Self-defense does not cover conduct in response to verbal provocation alone. The defendant must have reasonably believed the other person had done more than verbally provoke the defendant.

> The use of force against another is not justified if the defendant provoked the other's use of force against the defendant.

We note that the presentation of the provocation instruction magnified the harm from the lack of a full definition of provocation. By incorporating the provocation instruction into the self-defense instruction, the charge made it more likely that the jury's attention was drawn to the prosecution's provocation theory for avoiding Ballester's claim of self-defense. *See Reeves*, 420 S.W.3d 819 (making similar observation as to provocation instruction that immediately followed self-defense instruction); *Mendoza v. State*, 349 S.W.3d 273, 283 (Tex. App.—Dallas 2011, pet. ref'd) (same). The charge further instructed the jury that if the defendant provoked another, the jury was not required to find that the defendant had a "reasonable" belief that the force he used was immediately necessary and the legal presumption that his belief was "reasonable" does not apply. The jury charge as a whole allowed the jury to apply the common meanings of "provocation" and "provoked" when rendering their verdicts and deciding whether the self-defense claim was negated.

## 2. Arguments of counsel

Regarding the arguments of counsel, the record reflects that during closing arguments at the guilt/innocence stage, the prosecutor reserved the right to close but made only this brief opening

> The defendant is guilty. I will tell you a little bit more of that. We have proved all the elements. Self-defense doesn't apply. You will hear more about that in just a minute. Thank you.

Defense counsel objected that he did not know what evidence the prosecutor would summarize, which made his closing and his defense impossible. The trial court overruled that objection. Defense counsel proceeded with a closing argument based solely on Ballester's self-defense and defense of his family.

The prosecutor's closing argument capitalized on the trial court's exclusion of the legal definition of provocation by emphasizing its more expansive, common meaning. The common meaning of "provocation" is "the act of provoking: incitement." Merriam Webster Online Dictionary, http://www.merriam-webster.com/dictionary/provocation (last visited August 27, 2025). The common meaning of "provoke" is "to call forth (a feeling an action, etc.): evoke"; "to stir up purposely"; "to provide the needed stimulus for"; or "to incite to anger." *Id.* http://www.merriam-webster.com/dictionary/provoke (last visited August 27, 2025). By contrast, the legal definition of "provocation," when used as a limitation on a self-defense instruction, requires acts done or words used "for the purpose and with the intent that the defendant would have a pretext for inflicting harm upon the other." *Elizondo*, 487 S.W.3d at 197; *Smith*, 965 S.W.2d at 518. The prosecutor argued that when speaking with law enforcement about the loose-bull concern before the shooting occurred, Ballester was trying to plan a physical fight and what he would have to do to get Eudy, Shaw, and Carl in trouble. Emphasizing the self-defense disqualifiers, the prosecutor later noted that the jury did not all have to agree on which one of the disqualifiers the State had proved and specified that some on the jury "may think that the defendant provoked the victims." Or if the jury chose not to convict, they could say with their verdict that even if "he provoked everything, as long as he says self-defense he gets away with it."

20

Multiple times, the prosecutor told the jury that Ballester provoked everything that occurred because he was the instigator who "pulled his gun first" and was the first to "be aggressive," and on this basis, it must find guilt:

- "I want to talk to you first about this third element here, whether or not the defendant *provoked* the force that was used. Because when we were talking about that and looking at it, you have to believe that [Shaw] did have a gun."

- "[Y]ou heard the defendant pulled his gun first. He was the one that made the threat, pulled out the gun."

- "[H]e was the first one to ever pull out a gun and threaten and be aggressive."

- "[H]e is the one that is *provoking* all of this to happen."

- "He could have put the gun down at any time. He could have stopped threatening people with it. He could have stopped trying to *provoke* the very thing that happened[,] but he didn't. Even if you believe that this gun came out of Dalton Shaw's car [sic], it doesn't matter. The defendant is still guilty because he *provoked* everything that happened."

- "He *provoked* all of this and the force he used wasn't necessary. Because of that, you must find him guilty. Thank you."

(Emphases added.) The jury was never informed by instruction or argument that provocation required a calculated act intended to bring about a reaction that could be used as a pretext for the shooting. Inclusion of the legal definition of "provocation" in the charge would have reduced the likelihood of the jury being misled by the prosecutor's references to the common meaning of that word.

### 3. Entirety of the evidence

Ballester testified to facts that, if believed, would have supported his self-defense claim. Although there were differing accounts of the events that occurred, conviction was not a

21

foregone conclusion, as shown by Ballester's acquittal of the murder charge. Considering the entirety of the evidence at trial, we conclude that although there was conflicting evidence on Ballester's assertion of self-defense, the evidence of guilt was not so overwhelming that the trial court's erroneous exclusion of the legal definition of provocation necessarily caused him no harm. *See Reeves*, 420 S.W.3d 820 (reaching similar conclusion as to conflicting self-defense evidence).

### 4. Other relevant factors

It is relevant to the harm analysis that the exclusion of the legal definition of provocation undermined Ballester's sole defense. *See id.* at 821 (erroneous provocation instruction undermined sole claim of self-defense). The jurors, unaware of any distinction between the legal definition of provocation and its common, dictionary definition were left with no choice but to apply the latter. Significantly, the prosecutor relied on the common definition of provocation in the final words he spoke to the jury before they retired for deliberation. We cannot determine whether the jury actually rejected Ballester's assertion of self-defense because they disbelieved his testimony or if the jury was precluded from reaching the self-defense issue due to the jury charge's lack of a legal definition of provocation. We conclude that this factor weighs on the "some harm" side of the scale rather than the "no harm" side. *See id.*

On this record, we conclude that Ballester met his burden of showing that he sustained some harm when the trial court erroneously excluded from the charge the legal definition of provocation set forth in *Smith*, thereby preventing the jury from applying the technical or particular meaning of that word when considering the instruction provided on provoking the difficulty. *See Elizondo*, 487 S.W.3d at 209-10 (reversing defendant's murder

22

conviction for new trial after concluding, among other things, that jury was provided with erroneously worded instruction on "provoking the difficulty" in jury charge). "It is not the function of the charge merely to avoid misleading or confusing the jury: it is the function of the charge to lead and to prevent confusion." *Reeves*, 420 S.W.3d at 818. This charge fell short of its function. We sustain Ballester's second issue.[9]

## CONCLUSION

We reverse the district court's judgments of conviction and remand these cases for a new trial.

_____

Darlene Byrne, Chief Justice

Before Chief Justice Byrne, Justices Triana and Kelly

Reversed and Remanded

Filed: August 28, 2025

Do Not Publish

---

[9] Having sustained Ballester's second issue, we do not reach his issue as to the prosecutor's closing argument complaining that Ballester was physically present at his trial, heard the evidence presented against him, and consulted with his counsel before testifying.

23